Docket Nos. 97624, 97656 cons.–Agenda 10–March 2004.

ANN B. JORGENSEN 
et al.
, Appellees, v. ROD R.

 BLAGOJEVICH, Governor, 
et al.
, Appellants.

Opinion Filed May 20, 2004.

JUSTICE RARICK delivered the opinion of the court:

The issue before us is whether the General Assembly and the Governor violated the Illinois Constitution when they attempted to eliminate the cost-of-living adjustments to judicial salaries provided by law for the 2003 and 2004 fiscal years. The circuit court declared that they did. In addition, it ordered the Comptroller to include the cost-of-living adjustments for the 2004 fiscal year in the judges’ paychecks. The Governor and Comptroller have appealed. For the reasons that follow, we affirm.

Article VI, section 14, of the Illinois Constitution (Ill. Const. 1970, art. VI, §14) provides, in pertinent part:

“Judges shall receive salaries provided by law which shall not be diminished to take effect during their terms of office. All salaries and such expenses as may be provided by law shall be paid by the State ***.”

The Salaries Act (5 ILCS 290/0.1 (West 2002)) established the specific salaries the state was required to pay its judges for the fiscal year beginning July 1, 1982, and ending June 30, 1983. The Act further provided that judicial salaries were to be increased the following fiscal year. Beginning July 1, 1983, the state was obligated to pay judges either the increased rate set forth in the statute or the amount “set by the Compensation Review Board, whichever is greater, to be paid out of the State Treasury.” 5 ILCS 290/3 (West 2002) (judges of the supreme court); 5 ILCS 290/3.1 (West 2002) (judges of the appellate court); 5 ILCS 290/3.2 (West 2002) (judges of the circuit court); 5 ILCS 290/3.3(a) (West 2002) (associate judges of the circuit court).

The Compensation Review Board (the Board) was created by the Compensation Review Act (25 ILCS 120/1 
et seq.
 (West 2002)). Through the Act, the General Assembly conferred on the Board the power to determine the salaries of various government officials, including judges. The Board is required to undertake periodic reevaluations of those salaries and may adjust them based on various factors. Following its review, which includes public hearings, the Board determines the compensation for each of the covered offices and files a report with the General Assembly. Consistent with article VI, section 14, of the Illinois Constitution (Ill. Const. 1970, art. VI, §14), which forbids the diminishment of judicial salaries, the Compensation Review Act does not allow the Board to reduce the salaries paid to judges. With respect to judges, the Board may either leave salaries unchanged or increase them. 25 ILCS 120/4 (West 2002).

After the Board files its report, the General Assembly “may disapprove [it] in whole, or reduce it in whole proportionately.” 25 ILCS 120/5 (West 2002). Taking such action, however, requires adoption of a resolution by a majority of the members of the Senate and the House within 30 session days after each of those bodies has next convened after the Board files its report. 25 ILCS 120/5 (West 2002). If the General Assembly fails to adopt a resolution regarding the Board’s report in the manner and within the time specified by law, the salaries specified in the Board’s report take effect, and the General Assembly is required to appropriate the funds necessary to pay those salaries. 25 ILCS 120/6 (West 2002).

Pursuant to its authority under the Compensation Review Act, the Board issued a report in 1990. That report set specific salaries for each of the offices and positions covered by the Act. It also determined that the salaries for each of those offices and positions were to include cost-of-living adjustments, commonly known as COLAs. The COLAs were automatic annual adjustments based on the “Employment Cost Index, Wages and Salaries, By Occupation and Industry Groups: State and Local Government Workers: Public Administration,” published each year by the Bureau of Labor Statistics of the United States Department of Labor. The COLAs were deemed to be a component of salary fully vested when the Board’s report became law. The first adjustment under the new COLA provision was to take effect July 1, 1991. Subsequent adjustments were to be made on July 1 each year thereafter.

The Board submitted its 1990 report to the General Assembly as required by the Compensation Review Act. The General Assembly adopted a resolution pertaining to that report known as Senate Joint Resolution (SJR) 192. SJR 192 reduced “in whole proportionately” the amount of compensation set by the Board for the various offices and positions. In so doing, however, it expressly approved those portions of the Board’s report establishing annual cost-of-living adjustments for the affected offices and positions, including judges. In 2002, the General Assembly suspended the COLA implemented by SJR 192 for the state’s 2003 fiscal year by enacting Public Act 92–607. That legislation, which was codified as section 5.5 of the Compensation Review Act (25 ILCS 120/5.5 (West 2002)), did not purport to repeal either SJR 192 or any provision of the Compensation Review Act. It merely specified that the state officers and officials covered by the Act were prohibited from receiving any increase in compensation based on the COLA provisions of SJR 192 “for or during the fiscal year beginning July 1, 2002.” 25 ILCS 120/5.5 (West 2002). Based on this legislation, none of the affected officers and officials, including judges, were paid the COLA component of their salaries during the 2003 fiscal year. Had the 2003 COLA not been suspended, it would have amounted to 3.8% of the officers’ and officials’ salaries.

In the months following enactment of Public Act 92–607, the General Assembly determined that the statute, as applied to judges, violated the prohibition against diminishment of salaries set forth in article VI, section 14, of the Illinois Constitution (Ill. Const. 1970, art. VI, §14). Based on that determination, it passed Senate Bill (SB)100, which amended section 5.5 of the Compensation Review Act to include the following qualification:

“Notwithstanding the provisions of Public Act 92–607 or any other law, the cost-of-living adjustment otherwise authorized by Senate Joint Resolution 192 *** for judges shall be deemed to have taken effect for the fiscal year beginning July 1, 2002 and shall be payable.” 93d Ill. Gen. Assem., Senate Bill 100, 2003 Sess.

SB 100 was passed by the Senate on April 8, 2003. It was immediately sent to the House, where it passed on May 31, 2003. Because Public Act 92–607 affected only the COLA for the 2003 fiscal year, there was no need for the General Assembly to take any additional remedial action with respect to the COLA for the 2004 fiscal year. Under the provisions of SJR 192, judges were entitled to begin receiving their 2004 fiscal year COLA on July 1, 2003. The amount of that COLA was 2.8%. The General Assembly included funds to pay that COLA in its FY2004 appropriations bill, designated as House Bill (HB) 2700, which passed both houses of the legislature in the spring of 2003.

During the 2003 fiscal year, the total appropriation for the State of Illinois was approximately $39,308,238,000. Of that, only $298,276,700, or approximately seven tenths of one percent (0.7%), was appropriated to the judiciary. This percentage remained unchanged from the previous fiscal year and was typical of recent appropriation levels for the judiciary.

As small a component of state spending as the judiciary’s budget was, the Governor believed that the state should not allocate any additional funds to pay for the cost-of-living adjustments to judicial salaries for the 2004 fiscal year. The problem faced by the Governor in implementing his view was that neither the Compensation Review Act nor SJR 192 authorized him to intervene in the compensation process for covered officers and officials. Because he could not reduce the salaries directly, he attempted to alter them indirectly. On July 3, 2003, two days after the FY2004 COLA had taken effect pursuant to SJR 192, the Governor set out to circumvent the statutory compensation process by signing a reduction veto to HB 2700.

The portion of HB 2700 appropriating funds to the judicial branch contained no separate line item for cost-of-living adjustments. Instead, it included COLA funding along with the rest of the appropriation for judges’ pay under article 15, section 5, lines 12-13, “Personal Services: judges salaries.” The Governor’s reduction veto removed approximately $3.9 million from those lines. Because that sum was slightly more than the amount needed to pay the judges’ FY2004 COLA, the practical effect of the veto was to prevent the COLA from being implemented.

This court believed that the Governor’s use of his reduction veto to circumvent the Compensation Review Act and SJR 192 violated article VI, section 14, of the Illinois Constitution (Ill. Const. 1970, art. VI, §14) as well as article II, section 1, of the Illinois Constitution (Ill. Const. 1970, art. II, §1), which establishes the principle of separation of powers. Because the Governor’s actions were unconstitutional, we concluded that they did not affect the state’s statutory and constitutional obligations to pay judges their FY2004 COLA. At our direction, the Director of the Administrative Office of the Illinois Courts (AOIC) therefore included the FY2004 COLA in the payroll tapes it submitted to the Comptroller’s office for the July 2003 pay period.

The payroll tapes were submitted to the Comptroller on July 18, 2003. The Comptroller, however, refused to use those tapes, claiming he had no authority to process payment requests containing the FY2004 COLA unless and until the General Assembly decided to override the Governor’s reduction veto. Believing the Comptroller’s actions to be contrary to law, the Director of the AOIC resubmitted the tapes to him on July 23, 2003. When the Comptroller once again indicated that he would not process those tapes, this court issued an order in 
In re 
Illinois Judges Cost of Living Adjustment, M.R. 18893, which stated that

“the Office of the Comptroller shall process payment requests for judges’ compensation, including the FY ’04 judicial COLA, as submitted to the Comptroller on July 18, 2003, and resubmitted on July 23, 2003.”

The ordered was filed July 24, 2003, pursuant to this court’s administrative and supervisory authority for operation of the judicial branch. The same day, the Governor vetoed SB100 in an attempt to eliminate the judicial COLA for FY2003. The following day, the Hon. Benjamin E. Novoselsky, judge of the circuit court of Cook County, individually and on behalf of all other Illinois judges, petitioned for leave to bring an original 
mandamus 
action in our court pursuant to article VI, section 4(a), of the Illinois Constitution (Ill. Const. 1970, art. VI, §4(a)). That action, styled Novoselsky v. Hynes, No. 96698, asked that we issue a writ of 
mandamus 
directing the Comptroller to comply with our order of July 24, 2003, in M.R. 18893, and to pay Novoselsky and Illinois’ other judges the full amount due them under the law, including the FY2004 COLA, effective July 1, 2003. Novoselsky’s petition asserted that the Comptroller was required by law to include the FY2004 COLA in the judges’ paychecks, that he had no discretion to alter the judges’ salaries, and that his refusal to pay judges salaries reflecting their FY2004 COLA was in direct violation of the Illinois Constitution.

At the same time Judge Novoselsky filed his 
mandamus 
petition, the Hon. Ann B. Jorgensen, judge of the 18th Judicial Circuit, Du Page County, and the Hon. Stuart Nudelman, judge of the circuit court of Cook County, brought the action now before us. The action was filed in the circuit court of Cook County as a class action on behalf of all Illinois judges entitled to the FY2003 and FY2004 COLAs. It named as defendants both the Governor and the Comptroller.

The complaint contained two counts. Count I was addressed to the FY2004 COLA. It sought a declaration that the Governor’s attempt to block implementation of that COLA through his reduction veto of HB 2700 was unconstitutional and void and that Illinois judges were therefore entitled to receive the COLA as a component of their salaries effective July 1, 2003. It also requested an order from the court directing the Comptroller to pay judges the full salaries to which they were entitled, including the FY2004 COLA.

Count II of the complaint concerned the FY2003 COLA. It contended that Public Act 92–607, which suspended the FY2003 COLA, violated the prohibition against diminishment of judicial salaries set forth in article VI, section 14, of the Illinois Constitution (Ill. Const. 1970, art. VI, §14) and was therefore void and of no effect. In accordance with that contention, it requested a judgment declaring that Public Act 92–607 “cannot and does not prevent the payment of cost of living adjustments due Judges on and after July 1, 2002, as required by [SJR] 192.” It further requested an order from the court directing the Comptroller to authorize and issue payment to judges in the class for the portions of their salaries that had been wrongfully withheld pursuant to Public Act 92–607.

Despite this court’s order of July 24, 2003, requiring the Comptroller to include the FY2004 COLA when processing the payment requests for judges’ compensation submitted to him on July 18, 2003, and resubmitted on July 23, 2003, the Comptroller refused to do so. When the payment requests were processed, the Comptroller excluded the FY2004 COLA. This court therefore issued a new order, dated July 29, 2003, directing the Comptroller to appear in person to answer and show cause why he should not be held in civil contempt. In the same order, we allowed Judge Novoselsky’s petition for leave to file a writ of 
mandamus 
in cause No. 96689 and established an expedited briefing schedule for the parties. We also stayed “[a]ll proceedings in an other lower court” relating to the FY2003 and FY2004 COLAs, including the proceedings in this case.

In the midst of the foregoing developments, the Comptroller moved to vacate our order of July 24, 2003, in M.R. 18893. As grounds for that motion, he complained that we should not have acted 
sua sponte
 without having a complaint or petition before us, that we had not properly served him, and that we had not given him adequate notice or an opportunity to be heard before taking action. The Comptroller did not address the substantive legal issues raised by the failure to pay judges their FY2003 and FY2004 COLAs. He merely argued that those issues would be more appropriately addressed and resolved in a proceeding such as the circuit court action initiated by Judges Jorgensen and Nudelman in this case. He asserted that if the matter proceeded in that way, he would submit to the court’s jurisdiction voluntarily.

After taking the Comptroller’s motion to vacate under advisement, our court ultimately concluded that allowing the matter to proceed first in the circuit court was, indeed, the better course of action. Accordingly, on July 31, 2003, we granted the motion to vacate our order dated July 24, 2003, in M.R. 18893 and discharged the related rule to show cause. We also dismissed the original mandamus action brought by Judge Novoselsky under docket No. 96689 and lifted the stay of “any lower court proceedings relating to Illinois Judges’ FY’03 and FY’04 Cost of Living Adjustment.”

With the stay of lower court proceedings lifted, the case before us today was allowed to go forward. The Governor filed a motion pursuant to section 2–615 of the Code of Civil Procedure (735 ILCS 5/2–615 (West 2002)) to dismiss the Judges’ complaint on the pleadings. As authorized by section 2–619.1 of the Code of Civil Procedure (735 ILCS 5/2–619.1 (West 2002)), the Governor combined that motion with a motion for involuntary dismissal of the Judges’ action under section 2–619 of the Code of Civil Procedure (735 ILCS 5/2–619 (West 2002)). The Governor sought dismissal on the pleadings on the grounds that “Article VI, Section 14 of the Illinois Constitution does not entitle Plaintiffs to COLA in Fiscal Years 2003 and 2004.” His motion for involuntary dismissal asserted that count I, pertaining to the FY2004 COLA, was not ripe for adjudication and that count II, dealing with the FY2003 COLA, should be barred by 
laches
.

Combined motions for judgment on the pleadings and involuntary dismissal were also filed by the Comptroller. One significant difference between the Comptroller’s motions and those filed by the Governor is that the Comptroller did not address the legal status of the FY2003 and FY2004 COLAs or the validity of the attempts to block them. Instead, he made a narrower claim that he should be dismissed as a party “because there are no appropriations for judicial COLAs in fiscal years 2003 and 2004” and, in the absence of such appropriations, he could not be compelled to disburse the necessary funds.

After the foregoing motions were argued and taken under advisement, the Judges moved for an order pursuant to section 2–802 of the Code of Civil Procedure (735 ILCS 5/2–802 (West 2002)) allowing them to maintain their action as a class action. The circuit court granted that motion. With respect to count I, which pertained to the FY2004 COLA, the court identified the relevant class as “[a]ll persons who served as Judges of the State of Illinois on or after July 1, 2003.” With respect to count II, pertaining to the FY2003 COLA, the class was defined as “[a]ll persons who served as Judges of the State of Illinois on or after July 1, 2002.”

On the same day the circuit court granted class certification, the Judges moved for summary judgment pursuant to section 2–1005(a) of the Code of Civil Procedure (735 ILCS 5/2–1005(a) (West 2002)). The Governor and the Comptroller each filed cross-motions for summary judgment. In an order filed Nov. 24, 2003, the circuit court denied the motions by the Governor and Comptroller to dismiss count I of the Judges’ complaint. It entered summary judgment in favor of the Judges on that count, denied the corresponding cross-motion for summary judgment filed by the Governor and Comptroller, and ordered the Comptroller to pay the Judges, and the class of judges they represent, their FY2004 COLA. In so doing, the court made an express written finding under Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) that there was no just reason for delaying enforcement or appeal. The circuit court subsequently denied a stay of its order and issued a supplementary order specifying that the Comptroller had until the end of the following month to pay the COLA component of judicial salaries that had begun to accrue on July 1, 2003, and was past due.

With respect to count II of the Judges’ complaint, which challenged the refusal to pay the FY2003 COLA, the circuit court deferred ruling on the parties’ respective motions pending additional briefing. The Governor and Comptroller then filed an interlocutory appeal in the appellate court to challenge the circuit court’s judgment in favor of the Judges on count I. On the motion of the Governor and Comptroller, the appellate court stayed that judgment pending appeal. 155 Ill. 2d R. 305.

The day after the appellate court entered its stay as to count I, the circuit court disposed of the various outstanding motions related to count II. With respect to that count, the court denied the motions by the Governor and Comptroller to dismiss and granted summary judgment in favor of the Judges and against the Governor and Comptroller. In light of the appellate court’s stay with respect to count I, the circuit court refrained from attempting to fashion a specific remedy to redress the Judges’ claims under count II. It also stayed its judgment with respect to that count pending appeal.

The circuit court’s judgment in favor of the Judges and against the Governor and Comptroller on count II did not address the effect of SB 100, which attempted to restore the FY2003 COLA after its implementation was suspended by passage of Public Act 92–607. Nor did it consider the validity of the Governor’s actions in vetoing SB 100. Instead, in accordance with the theory advanced by the Judges in their complaint, it held that Public Act 92–607 was itself invalid because it violated the prohibition against diminishment of judicial salaries set forth in article VI, section 14, of the Illinois Constitution (Ill. Const. 1970, art. VI, §14).

Because the circuit court’s judgment as to count II invalidated a statute, the Governor and Comptroller appealed that judgment directly to this court in accordance with Supreme Court Rule 302(a) (134 Ill. 2d R. 302(a)). Shortly thereafter, all parties to this litigation filed a joint motion under Supreme Court Rule 302(b) (134 Ill. 2d R. 302(b)) to have the appeal of the judgment entered on count I taken directly to our court as well, to consolidate that appeal with the appeal from the judgment on count II, and to place the consolidated appeals on an accelerated docket in accordance with Supreme Court Rule 311 (155 Ill. 2d R. 311). Our court granted that motion in full. Following consolidation, we allowed the Chicago Bar Association and the Illinois State Bar Association to appear as 
amici curiae
. The matter was subsequently briefed and argued. It is now before us for review.

We begin by noting that none of the parties have questioned the propriety of our consideration of this case. All seven members of our court belong to both classes of judges defined by the circuit court and therefore have a pecuniary interest in the outcome of these proceedings. Such an interest would normally require us to disqualify ourselves. That option is not available to us here. Illinois law makes no provision for appointing temporary alternative jurists to sit in our place. Even if it did, there would be no one for us to choose who did not face the same conflict of interest. All sitting Illinois judges will be affected by the outcome of this appeal. Were we to recuse ourselves, the parties would therefore be left without a forum in which to review the circuit court’s judgment. Their right to appeal would be lost. Under these circumstances, the common law “rule of necessity” obligates us to proceed. See 
United States v. Will
, 449 U.S. 200, 214-15, 66 L. Ed. 2d 392, 405-06, 101 S. Ct. 471, 480-81 (1980).

Like the federal government on which it is modeled, the government of the State of Illinois is divided into three equal branches, the legislative, the executive, and judicial. Article II, section 1, of the Illinois Constitution, states:

“The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another.” Ill. Const. 1970, art. II, §1.

This provision embodies the doctrine of separation of powers which has been a hallmark of American government since ratification of the United States Constitution. The doctrine

“is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital [citation]; namely, to preclude a commingling of these essentially different powers of government in the same hands.” 
O’Donoghue v. United States
, 289 U.S. 516, 530, 77 L. Ed. 1356, 1360, 53 S. Ct. 740, 743 (1933).

Avoiding the concentration of governmental powers in the same person or political body was seen by the founding fathers as essential to freedom and liberty. Preventing the excessive concentration of authority by one branch is why the system of mutual checks and balances by and among the three branches of government was incorporated into the structure of our government. 3 C. Antieau, Modern Constitutional Law 376-77 (2d ed. 1997). For checks and balances to work properly in protecting individual liberty, each of the three branches of government must be kept free from the control or coercive influence of the other branches. Insuring the independence of the respective branches of government is the real thrust of the separation of powers doctrine. 
People ex rel. Baricevic v. Wharton
, 136 Ill. 2d 423, 432 (1990).

While the three branches of government enjoy equal status under the constitution, their ability to withstand incursions from their coordinate branches differs significantly. The judicial branch is the most vulnerable. It has no treasury. It possesses no power to impose or collect taxes. It commands no militia. To sustain itself financially and to implement its decisions, it is dependent on the legislative and executive branches.

This presents a profound problem. As arbiters of the law and guardians of individual liberties, members of the judiciary often find themselves at odds with these other branches of government. In fulfilling their duties, judges must frequently challenge the actions of the very governmental bodies who provide the financial and other resources they need to operate. Such challenges are unavoidable. They are an inherent part of the adjudicatory process. That their constitutional duty requires this of judges does not mean their decisions will be well received by the other branches of government. Retribution against the courts for unpopular decisions is an ongoing threat.

The vulnerability of the judicial branch is exacerbated because, unlike the executive and legislative branches, the judiciary has no true electoral constituency. Although judges in Illinois are elected, they do not represent the voters in the same way executive officers or legislators do. Citizens in a community typically refer to “their alderman,” “their representative,” “their senator,” or “their mayor,” but no member of the public can rightly claim a particular member of the judiciary as “their judge.” Lacking an electoral constituency, judges command no popular allegiance. That, in turn, renders them easy targets for those who would condemn unpopular judicial rulings.

In the Federalist, No. 78, Alexander Hamilton touched on some of these issues. He wrote:

“The executive not only dispenses the honors, but holds the sword of the community. The Legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither force nor will, but merely judgment. This simple view of the matter suggests several important consequences. It proves incontestably that the judiciary is beyond comparison the weakest of the three departments of power; that it can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks.”

One of the principal means by which the founding fathers sought to protect the judiciary was by denying to the other branches of government the power to diminish judicial compensation. The prohibition against reducing the pay of federal judges is set forth in article III, section 1, of the United States Constitution (U.S. Const., art. III, §1), the so-called compensation clause. In 
Evans v. Gore
, 253 U.S. 245, 253-54, 64 L. Ed. 887, 892, 40 S. Ct. 550, 553 (1920), the United States Supreme Court explained that the primary purpose of the compensation clause was not to benefit the judges,

“but, like the clause in respect of tenure, to attract good and competent men [and women] to the bench and to promote that independence of action and judgment which is essential to the maintenance of the guaranties, limitations, and pervading principles of the Constitution and to the administration of justice without respect to persons and with equal concern for the poor and the rich. Such being its purpose, it is to be construed, not as a private grant, but as a limitation imposed in the public interest ***.”

Although 
Evans v. Gore
 was overruled, in part, by 
United States v. Hatter
, 532 U.S. 557, 149 L. Ed. 2d 820, 121 S. Ct. 1782 (2001), the United States Supreme Court made clear in 
Hatter 
that it was reaffirming 
Evans’
 explanation of the compensation clause’s importance in insuring judicial independence. 
Hatter
, 532 U.S. at 567, 149 L. Ed. 2d at 832, 121 S. Ct. at 1790. The Hatter Court also affirmed another point made in 
Evans
, namely, that the protections afforded by compensation clause do not merely prohibit the direct reduction of a judge’s salary. They also forbid actions that indirectly result in an improper diminution in judicial compensation. 
Hatter
, 532 U.S. at 569, 149 L. Ed. 2d at 833, 121 S. Ct. at 1791.

In addressing the reach of the compensation clause, the 
Evans
 court wrote:

“Obviously, diminution may be effected in more ways than one. Some may be direct and others indirect, or even evasive ***. But all which by their necessary operation and effect withhold or take from the judge a part of that which has been promised by law for his services must be regarded as within the prohibition. Nothing short of this will give full effect to its spirit and principle.” 
Evans
, 253 U.S. at 254, 64 L. Ed. at 892, 40 S. Ct. at 553.

The Supreme Court subsequently repeated this passage, with favor, in 
O’Donoghue v. United States
, 289 U.S. at 533, 77 L. Ed. at 1362, 53 S. Ct. at 744, when it held that the prohibition against diminishment of judicial salaries applied to judges of the Supreme Court and Court of Appeals of the District of Columbia.

The prohibition against reduction in judicial compensation is not limited to situations where the legislative or executive branches seek to withdraw funding from the courts as retribution for decisions they have rendered. It applies with equal force to situations where the legislature or executive branches attempt to reduce funding for the courts based on adverse economic conditions. When economic downturns have depressed tax revenues and strained the government’s coffers, legislators and executive branch officers have sometimes attempted to address their budgetary shortfalls by lowering the amounts paid to judges. Notable examples occurred during the Great Depression of the 1930s. At the federal level, the Comptroller General of the United States attempted to lower the amounts paid to judges on the Supreme Court and Court of Appeals of the District of Columbia. In rejecting that effort, the United States Supreme Court held that those judges were of equal rank and power with those of other inferior courts of the federal system, “and plainly within the spirit and reason of the compensation provision.” 
O’Donoghue v. United States
, 289 U.S. at 534, 77 L. Ed. at 1362, 53 S. Ct. at 744.

The Court emphasized the critical role played by protection of judicial compensation in ensuring the independence of judges and the protection of liberty. Although the Court realized how unpopular efforts to protect judicial pay might be when economic conditions were so poor for so many, the Court wrote that members of the judiciary must look beyond their personal feelings and stand up for the courts as an institution. Indeed, it wrote that

“it is not extravagant to say that there rests upon every federal judge affected nothing less than a duty to withstand any attempt, directly or indirectly in contravention of the Constitution, to diminish this compensation, not for his private advantage–which, if that were all, he might willingly forego–but in the interest of preserving unimpaired an essential safeguard adopted as a continuing guaranty of an independent judicial administration for the benefit of the whole people.” 
O’Donoghue v. United States
, 289 U.S. at 533-34, 77 L. Ed. at 1362, 53 S. Ct. at 744

A similar situation was addressed by this court in 
People ex rel. Lyle v. City of Chicago
, 360 Ill. 25 (1935), decided two years after 
O’Donoghue v. United States.
 In that case, the City of Chicago omitted from its annual appropriations for 1932, 1933 and 1934 a portion of the funds necessary to pay the full salaries of the chief justice and 36 associate judges of the municipal court of Chicago. Those judges were subject to a provision of the Illinois Constitution that prevented their compensation from being diminished during their terms of office. Their salaries were also protected from reductions by a provision of the Municipal Court Act then in effect.

In justifying its failure to comply with the foregoing provisions, the City claimed that it was in dire financial straits. According to the City, a large part of the taxes from 1929 to 1932, inclusive, were not and could not be collected, and because of “the reassessment of property in Cook county the levies and extensions of taxes were over-due from two to three years.” 
People ex rel. Lyle v. City of Chicago
, 360 Ill. at 27. Due to this budgetary shortfall, the City asserted that it could not comply with the above-noted provisions without curtailing the essential functions of government. The City contended that requiring it to pay the judge’s full salaries as required by law would cripple activities for the prevention of crime, fire and the spread of disease. 
People ex rel. Lyle v. City of Chicago
, 360 Ill. at 28-29.

Our court rejected the City’s position. We held that legitimate efforts to relieve the City’s difficulties were commendable. We noted, however, that any departure from the law is impermissible unless justification for that departure is found within the law itself. Exigent circumstances are not enough. “Neither the legislature nor any executive or judicial officer may disregard the provisions of the constitution even in case of a great emergency.” 
People ex rel. Lyle v. City of Chicago
, 360 Ill. at 29. Because the provisions prohibiting reduction in judicial salaries were plain and unequivocal and contained nothing that expressly or impliedly authorized deviation from their terms, we held that the City had no authority to change the judges’ salaries during the terms for which they were elected.

 “Municipal authorities are charged by law with making all appropriations for the expenses of the municipality, and it was manifestly their duty to make the necessary appropriations for the full amount of the salaries of [these judges]. If appropriating such amounts will curtail other funds and hamper some needed activity of the city, that situation is, of course, unfortunate but does not justify the violation of the law.” 
People ex rel. Lyle v. City of Chicago
, 360 Ill. at 30.

We therefore granted a writ of 
mandamus 
to compel the City to appropriate and pay the portion of the judges’ salaries that had been withheld during the preceding years.

The rule prohibiting the diminishment of judicial salaries was adopted by the people of this state when they ratified the Illinois Constitution of 1970. Ill. Const. 1970, art. VI, §14. Its terms are clear and unconditional. It constrains not only the legislature, but the executive branch as well. No state officer, official or entity may take any action, directly or indirectly, that diminishes a judge’s pay during his term of office. Under the Illinois Constitution, there is one and only one exception to this rule. The Court’s Commission may suspend a judge without pay based on willful misconduct in office, the persistent failure to perform his or her duties, or various other reasons set forth in article VI, section 15(e) (Ill. Const. 1970, art. VI, §15(e)). That exception has no possible application to the litigation before us.

Whether Public Act 92–607 and the Governor’s reduction veto of HB 2700 resulted in an unconstitutional diminishment of judicial salaries was considered by the circuit court in the context of motions to dismiss and for summary judgment and presents a question of law, which we review 
de novo
. See 
Hawthorne v. Village of Olympia Fields
, 204 Ill. 2d 243, 254-55 (2003). In this appeal, the Governor does not dispute that the Illinois Constitution prohibits the state, its officers and officials from reducing a judge’s salary during the judge’s term of office. Nor does he deny that cost-of-living adjustments can be a component of salary subject to the prohibition against salary reductions. His argument is that Public Act 92–607, which suspended the judiciary’s FY2003 COLA, and his reduction veto of HB 2700, which removed the funding for the judiciary’s FY2004 COLA, cannot be said to have reduced the judges’ salaries in violation of article VI, section 14 (Ill. Const. 1970, art. VI, §14), because the COLAs in question had not yet taken effect.

In addressing this argument, the Governor directs our attention to 
United States v. Will
, 449 U.S. 200, 66 L. Ed. 2d 392, 101 S. Ct. 471 (1980). In that case, the United States Supreme Court held that the compensation clause of the United States Constitution bars Congress from repealing or postponing judicial COLAs which have already vested. The Court further held, however, that if the legislature blocks or repeals a COLA before that COLA has taken effect as part of the compensation due and payable to judges, the legislature’s actions will not violate the compensation clause.

 
Will
 does not support the Governor’s actions in this case. Whether the federal COLAs at issue in 
Will
 had “vested” for purposes of the compensation clause was determined by federal law. Whether the state judicial COLAs at issue here had vested for purposes of article VI, section 14, of the Illinois Constitution (Ill. Const. 1970, art. VI, §14) is determined exclusively by the law of the State of Illinois. We detailed the legal genesis of judicial COLAs at the outset of this opinion. The standards for conferring and calculating COLAs were developed by the Compensation Review Board pursuant to its statutory authority under the Compensation Review Act. Those standards, which were formulated following the United States Supreme Court’s decision in 
Will
, expressly provided that COLAs were to be given on July 1, 1991, and on July 1 of each year thereafter and that such COLAs were to be considered a component of salary fully vested at the time the Compensation Review Board’s report became law.
(footnote: 1) The report was submitted to the General Assembly as required by the Compensation Review Act. In SJR 192, both houses of the General Assembly adopted the COLA provisions of the Compensation Review Board’s report. SJR 192 was passed in June 1990. Pursuant to those provisions, COLAs have thus been a fully vested component of judicial salaries in Illinois since 1990.

 This construction of the law is supported by the legislature. Every General Assembly convened since 1990 has recognized that the COLAs implemented by SJR 192 are a vested component of the salaries authorized by law. That is why funds were consistently appropriated for the COLAs and it is why both houses of the General Assembly passed SB 100 to lift the suspension on judicial FY2003 COLAs imposed by Public Act 92–607. The remarks of SB100’s sponsors and the floor debates from both houses are clear, consistent and unambiguous on the point. Because SJR 192 made COLAs a vested component of judicial salaries in 1990, the legislature realized that Public Act 92–607 could not be applied to judges in FY2003 without violating the prohibition against diminishment of judicial salaries contained in article VI, section 14, of the Illinois Constitution.

Under the foregoing circumstances, the Governor cannot avoid applicability of article VI, section 14 on the theory that the COLAs at issue in this case were not vested and had not yet taken effect. That is so with respect to the FY2004 COLA as well as the COLA for FY2003. Because the FY2003 and FY2004 COLAs were vested, the efforts by the legislature and Governor to prevent the Judges from receiving them violated article VI, section 14. The circuit court was therefore correct to invalidate Public Act 92–607. It was also correct to declare invalid the Governor’s attempt to limit funds for the payment of judicial COLAs through his reduction veto of HB 2700.

In urging us to reverse the circuit court’s judgment, the Governor cites 
Quinn v. Donnewald
, 107 Ill. 2d 179 (1985). That case addressed the constitutionality of the Compensation Review Act. The Governor reads the decision as suggesting that salary changes recommended by the Compensation Review Board can subsequently be overridden by the Governor and the legislature through the appropriations process. The Judges take strenuous objection to that interpretation, arguing that passages cited by the Governor are mere 
dicta
, were characterized by the Governor incorrectly, and did not reflect what actually happened in that case.

We shall not address the specific details of the Judges’ arguments because we find the case inapposite for other reasons. First, 
Quinn
 involved conventional salary changes, not cost-of-living adjustments. It was decided five years before the provisions governing cost-of-living adjustments were established by the Compensation Review Board and adopted by the General Assembly pursuant to SJR 192. Those COLA provisions operate and were intended to operate in a fundamentally different way than standard raises. Second, as we have discussed, the prohibition against diminishment of judicial salaries and the doctrine of separation of powers place judicial salaries in a qualitatively different legal posture than salaries paid to other state officers and employees. The unique constitutional limitations governing changes in judicial salaries were not considered by the court when it decided 
Quinn.
 That decision therefore cannot be invoked by the Governor in support of his position.

The Governor further assails the circuit court’s judgment based on a number of arguments related to his authority as chief executive to veto legislation enacted by the General Assembly. Those arguments are relevant only to the FY2004 COLA. The Governor did exercise his veto power with respect to the FY2003 COLA when he vetoed SB 100’s repeal of Public Act 92–607. That veto, however, only implicated the legislature’s attempt to repeal Public Act 92–607. It did not, in any way, preclude this court from declaring Public Act 92–607 to be constitutionally infirm. Because we agree with the circuit court that Public Act 92–607 is unconstitutional, and because it is unconstitutional in its entirety, the statute has no force or effect. It is void 
ab initio
. It is as if the law had never been passed. See 
People v. Gersch
, 135 Ill. 2d 384, 399 (1990). There is no principle of law under which the Governor’s veto of SB 100 could alter that conclusion. The veto of a repeal of a nonexistent law has no legal consequences. The validity of that veto therefore need not be reached.

With respect to the Governor’s reduction veto of HB 2700, which was directed at the FY2004 COLA, the Governor’s arguments fail on the merits. A cornerstone of the Governor’s defense is that when he exercised his veto power, he acted legislatively and is therefore entitled to legislative immunity. As a preliminary matter, we note that most of the cases cited by the Governor were decided by federal courts, not the courts of Illinois. In Illinois, legislative immunity is addressed in article IV, section 12, of the Illinois Constitution (Ill. Const. 1970, art. IV, §12) and section 107–7 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107–7 (West 2000)). Neither of those provisions is applicable to the Governor.

We note, moreover, that the Judges have not sought to hold the Governor personally liable for his actions, nor are they attempting to force him to take or to refrain from taking any particular action. He was named in the litigation because he was one of the state officials involved in the sequence of events which led to the failure of the Judges to receive their FY2004 COLAs. There is nothing unusual about his inclusion as a party. Examples of Illinois governors being joined as defendants in cases seeking declaratory and injunctive relief based on alleged violations of state constitutional and legal requirements are commonplace. See, 
e.g.
, 
Tully v. Edgar
, 171 Ill. 2d 297 (1996); 
Chicago National League Ball Club, Inc. v. Thompson
, 108 Ill. 2d 357 (1985); 
People ex rel. Illinois Federation of Teachers v. Lindberg
, 60 Ill. 2d 266 (1975); 
Livingston v. Ogilvie
, 43 Ill. 2d 9 (1969); 
People ex rel. Engle v. Kerner
, 33 Ill. 2d 11 (1965).

While he has expressed his defense in terms of immunity, the Governor’s argument goes far beyond conventional immunity doctrine. Distilled to its essence, the Governor’s position is that the constitutionality of his official actions is simply not subject to judicial oversight. No Illinois court has ever so held. Such a claim is, in fact, incompatible with the principles of separation of powers and checks and balances that are the foundation for our tripartite system of government. The executive branch, no less than the legislative branch, is bound by the commands of our constitution. The judicial power of the State of Illinois is vested in the courts (Ill. Const. 1970, art. VI, §1), and it is the duty of the judiciary to construe the constitution and determine whether its provisions have been disregarded by either of the other branches of government. 
Rock v. Thompson
, 85 Ill. 2d 410, 418 (1981); 
People ex rel. Harrod v. Illinois Courts Comm’n
, 69 Ill. 2d 445, 458 (1977). If officials of the executive branch have exceeded their lawful authority, the courts have not hesitated and must not hesitate to say so. See 
West Side Organization Health Services Corp. v. Thompson
, 73 Ill. App. 3d 179, 187 (1979), 
rev’d on other grounds
, 79 Ill. 2d 503 (1980).

The Governor and the Comptroller raise a variety of additional arguments in support of their claim that the circuit court’s judgment should be reversed, including 
laches 
and a concern over how the circuit court defined the relevant classes. We have considered those arguments and find them without merit. The only remaining issue warranting discussion is the claim that the Judges are not entitled to relief because there has been no appropriation to pay the FY2003 and FY2004 COLAs. With respect to the FY2004 COLA, this claim is easily disposed of. The General Assembly did appropriate the necessary funds in HB 2700. The status of that appropriation was put in issue only because of the Governor’s reduction veto. As we have held, however, that reduction veto was unconstitutional. As such, it has no force or effect. That being the case, it did not operate to reduce the funding for judicial salaries provided by HB 2700.

The situation with respect to the FY2003 COLA is more complex. The money to pay that COLA has not been included in appropriations enacted by the General Assembly. The absence of such an appropriation, however, cannot be invoked by the Comptroller to defeat the Judges’ constitutionally protected right against reduction in their salaries. The State Comptroller Act provides that an obligation or expenditure must be “pursuant to law and authorized” before the Comptroller may draw a warrant for its payment. 15 ILCS 405/9(b) (West 2002). In most instances the requisite authority is found in statutory enactments supported by relevant appropriations. Other types of “obligational or expenditure authority,” however, will also suffice. See 15 ILCS 405/9(b), (c) (West 2002). In the case before us, that authority is furnished by a court order.

We repeat a point made earlier in this opinion. The Illinois Constitution of 1970 places the judicial power of government in the courts. See Ill. Const. 1970, art. VI, §1. The judicial power includes “all powers necessary for complete performance of the judicial functions.” 
People ex rel. Illinois State Bar Ass’n v. Peoples Stock Yards State Bank
, 344 Ill. 462, 470 (1931). Among those powers is the power to administer the court system.
 Administrative Office of the Illinois Courts v. State & Municipal Teamsters, Chauffeurs & Helpers Union, Local 726
, 167 Ill. 2d 180, 191-92 (1995); 
People v. Joseph
, 113 Ill. 2d 36, 42 (1986); see also 
People ex rel. Baricevic v. Wharton
, 136 Ill. 2d 423, 432 (1990). Indeed, article VI, section 16, of the Illinois Constitution (Ill. Const. 1970, art. VI, §16) expressly provides that “[g]eneral administrative and supervisory authority over all courts is vested in the Supreme Court.”

The court’s administrative authority over the judicial branch carries with it the corresponding authority to require production of the facilities, personnel and resources necessary to enable the judicial branch to perform its constitutional responsibilities. That includes payment of the judicial salaries provided by law. There is no question that such authority must be invoked sparingly. The courts will normally defer to the other governmental branches having initial responsibility for providing the necessary funding. When those branches have failed to furnish resources essential to the court’s operations, however, the judiciary may compel them to act through appropriate order
. 
See
 Knuepfer v. Fawell
, 96 Ill. 2d 284, 293-94 (1983).

Jurisdictions throughout the United States have reached the same conclusion. Annotation, G. Spivey, 
Inherent Power of Court to Compel Appropriation or Expenditure of Funds for Judicial Purposes
, 59 A.L.R.3d 569 (1974). In 
Commonwealth ex rel. Carroll v. Tate
, 442 Pa. 45, 51-53, 274 A.2d 193, 196-97 (1971), the Supreme Court of Pennsylvania wrote:

“It is a basic precept of our Constitutional form of Republican Government that the Judiciary is an independent and co-equal Branch of Government, along with the Executive and Legislative Branches. [Citations.]

***

Because of the basic functions and inherent powers of the three co-equal Branches of Government, the co-equal independent Judiciary must possess rights and powers co-equal with its functions and duties, including the right and power to protect itself against any impairment thereof. [Citations.]

Expressed in other words, the Judiciary 
must possess
 the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities, and its powers and duties to administer Justice, if it is to be in reality a co-equal, independent Branch of our Government. This principle has long been recognized, not only in this Commonwealth but also throughout our Nation. [Citations.]

The very genius of our tripartite Government is based upon the proper exercise of their respective powers together with harmonious cooperation between the three independent Branches. [Citation.] However, if this cooperation breaks down, the Judiciary must exercise its inherent power to preserve the efficient and expeditious administration of Justice and protect it from being impaired or destroyed. [Citations.]” (Emphasis in original.)

Our court has cited the foregoing case on a number of occasions in the past. See 
Orenic v. Illinois State Labor Relations Board
, 127 Ill. 2d 453, 462 (1989); 
Knuepfer v. Fawell
, 96 Ill. 2d at 293; 
People ex rel. Bier v. Scholz
, 77 Ill. 2d 12, 20 (1979). We have done so because the points it makes are well considered. In the case before us, the Governor and Comptroller minimize the effects withholding COLAs will have on the judiciary. Those effects, however, are beside the point. What is at stake is the very independence of the judiciary and the preservation of separation of powers. If the executive branch possessed the authority to withhold judicial salaries in violation of the constitution, there would be nothing to constrain it from withholding funding for other necessary expenses incurred by the judicial branch and mandated by law. Today the Governor may decide judges are paid too much. Tomorrow he may decide there are too many judges. Eventually he may decide the state would be better off without judges at all. The concern expressed by the court in 
Commonwealth ex rel. Carroll v. Tate
 over the destruction of the judiciary would be realized.

Our court has held that “[w]here a statute categorically commands the performance of an act, so much money as is necessary to obey the command may be disbursed without any explicit appropriation.” 
Antle v. Tuchbreiter
, 414 Ill. 571, 581 (1953). If that is so with respect to statutorily mandated action, it is unquestionably so with respect to actions compelled by the constitution. Article VI, section 14, of the Constitution provides that judges “
shall
 receive salaries provided by law” and that “[a]ll salaries and such expenses as may be provided by law 
shall 
be paid by the State.” (Emphases added.) The State of Illinois has not honored this constitutional obligation. The judges of Illinois are entitled, by law, to COLAs for FY2003 and FY2004. The state has failed and refused to pay them. We therefore conclude that it is within the power of the judicial branch to compel the State to pay the FY2003 COLA without a specific appropriation for that payment, just as it can compel payment of the FY2004 COLA.

The Comptroller resists this conclusion based on 
Board of Trustees of Community College District No. 508 v. Burris
, 118 Ill. 2d 465 (1987). 
Burris
 upheld the refusal of one of the Comptroller’s predecessors in office to reimburse a community college district out of state funds for veteran’s scholarships it had bestowed on some of its students. The reimbursement was refused because the comptroller had neither appropriation authority nor “expenditure authority other than appropriation” to make the payment. In upholding the comptroller’s actions, we noted that if the comptroller incurred obligations without the requisite authority, he could unilaterally override actions of the Governor and legislature, “creating obvious problems under the separation of powers doctrine.” 
Burris
, 118 Ill. 2d at 479.

That situation is not before us here. The Comptroller is not being asked to draw warrants without authorization. We hereby give him authorization by court order. That order is issued pursuant to the inherent right of the courts to order payment of judicial salaries which the state was required by our constitution to make, a situation not presented or addressed by 
Burris
. The distinction is critical. As we have just noted, the circumstances in 
Burris
 were such that compelling the comptroller to act would have created separation of powers problems. In this case, by contrast, compelling him to draw the warrants for the FY2003 COLA is necessary to prevent the separation of powers doctrine from being violated.

Because of the posture of this litigation when the circuit court ruled on the Judges’ entitlement to the FY2003 COLA, that court refrained from issuing an order specifying how and under what circumstances the COLA should be paid. Although we could remand for further proceedings regarding that matter, we see no need to do so. The law is settled, the remedy is clear, and under Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 366(a)(5)), we have the authority, on such terms as we deem fit, to

“enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief *** that the case may require.”

Pursuant to that authority, we have concluded that the Comptroller shall, upon receipt of vouchers prepared by the Administrative Office of the Illinois Courts, issue warrants drawn on the treasury of the State of Illinois, to pay the judicial COLA for FY2003 as well as the COLA for FY2004.

In reaching this result, we acknowledge that substantial budgetary challenges currently confront the Governor and the General Assembly. The adverse economic conditions facing so many of our fellow citizens have taken an inevitable toll on the state’s treasury. Revenues are not keeping pace. Despite ongoing efforts by the Governor and legislature, shortfalls persist. We do not mean to diminish the seriousness of the situation or appear insensitive to the difficulties faced by our coordinate branches of government. Those difficulties are undeniable, and we are highly cognizant of the need for austerity and restraint in our spending. As administrators of the judiciary, we make every effort to economize whenever and however we can. One thing we cannot do, however, is ignore the Constitution of Illinois.

This court did not set the salaries judges receive, nor did we make COLAs a component of those salaries. The salaries, including their COLA component, were provided by law in the manner described earlier in this opinion, Now that those salaries have been implemented, the constitution commands that they be paid. No principle of law permits us to suspend constitutional requirements for economic reasons, no matter how compelling those reasons may seem.

For the foregoing reasons, the judgment of the circuit court is affirmed. Upon receipt of vouchers prepared by the Administrative Office of the Illinois Courts, the Comptroller is hereby ordered to issue warrants drawn on the treasury of the State of Illinois 
to pay the Judges
, and the class of judges they represent, the judicial COLAs due and owing for FY2003 and FY2004. 
Any matters that arise in connection with execution of this judgment shall be presented directly to our court. Because both parties have requested an expedited hearing and ruling in this matter, the mandate shall issue immediately.

Affirmed.

FOOTNOTES
1:     
1
The text of the report actually states that the COLAs it established would be fully vested “at the time the other provisions of the Report became law.” This language is set forth at the conclusion of the report, following all of the Board’s other statements and determinations. The Governor argues that no other provisions of the report actually became law and that the vesting provision therefore never became operative. This argument is untenable. Although the General Assembly ultimately rejected most of the findings in the report, it quite clearly adopted paragraphs 15 and 16, and those are paragraphs in which the Board determined that salaries were to include COLAs.