*In re* Collective Bargaining

Order entered July 1, 2004.

JUSTICE FITZGERALD, writing in support:

Contrary to the position espoused by dissenting Justice Thomas, today's order, recognizing the International Brotherhood of Electrical Workers (IBEW) as the bargaining representative for court reporters in the first judicial district (Cook County) does not "set a clear and dangerous precedent" and does not "strike a blow" to this court's independence. This court's commitment to the preservation of separation of powers and the independence of the judiciary, even in the face of political pressure, is alive and well and was recently reaffirmed by this court in *Jorgensen v. Blagojevich*, 211 Ill. 2d 286 (2004). There, in an unanimous opinion, this court demonstrated its resolve that "the three branches of government must be kept free from the control or coercive influence of the other branches." *Jorgensen*, 211 Ill. 2d at 299. In light of *Jorgensen*, I find it disheartening that Justice Thomas would conclude that, in the instant matter, I and my fellow justices in the majority "capitulated" under legislative and political pressure. Today's order reflects the reasoned judgment of a majority of this court that, even if we have the power to deny court reporters the ability to proceed with efforts to bargain collectively, it is a power that we should not exercise in this instance.

Justice Thomas' dissent focuses on recent legislation amending the Court Reporters Act (Act) (705 ILCS 70/1 *et seq.* (West 2002)), such amendments purportedly

constituting an overt attempt to require this court to bargain collectively with court reporters over wages, hours and terms and conditions of employment. See Pub. Act 93—89, eff. July 2, 2003; 93d Ill. Gen. Assem., House Bill 5445, 2004 Sess. To the extent this dissent suggests that such legislation raises constitutional questions implicating the separation of powers doctrine (Ill. Const. 1970, art. II, § 1), I am in agreement. But those questions are not now before us and should be left to a time when they are. What I am not in agreement with is Justice Thomas' assumption that the legislature's action forced our hand. Quite the contrary is true. In my view, the amendments to the Act were an impediment to voluntary recognition of the IBEW, not a catalyst. Recognition of the IBEW by this court, in the face of such legislative action, could very well have communicated this court's compliance with the legislative mandate that it "shall" bargain collectively with court reporters in this state, suggesting that the will of the court had been dominated by the legislature. See 705 ILCS 70/8.2 (as amended by Pub. Act 93—89, eff. July 2, 2003). However, this court has twice indicated that it would not comply with the terms of the amended Act and would not be compelled to do so. See M.R. 3140 (April 15, 2004) (adopting new Supreme Court Rule 45, providing that "[c]ourt reporting services resources shall be governed by rules and regulations promulgated by the Supreme Court"); No. 97542 (May 13, 2004) (order denying the IBEW's petition for a writ of *mandamus* seeking to compel this court to comply with the amended Act). But see M.R. 3140 (April 15, 2004) (Kilbride, J., dissenting from adoption of Supreme Court Rule 45). As these orders affirmatively demonstrate, this court did not "capitulate." What accounts then for my vote in favor of voluntary recognition of the IBEW if not legislative or political pressure? An honest belief that such recognition is proper and fair.

Court reporters in Cook County work side by side in courtrooms with other wage earners who enjoy the benefits of union membership: court clerks, probation officers, deputy sheriffs, police officers, and public defenders. The fact that these groups of workers are provided the opportunity for union membership leads to the inescapable and just conclusion that court reporters, who work alongside them, should have the same opportunity. Court reporters have indicated by their vote of 124 to 3 their desire to unionize.[1] Assuming an acceptable agreement can be reached between this court and the IBEW, and the General Assembly is able to make sufficient appropriations to further this action, we should voluntarily recognize the union and let their desire be realized. That the court reporters are employed by this court, rather than the City of Chicago or Cook County, does not alter this conclusion.

Although dissenting Justices Freeman and Garman express concern that our action today is inconsistent with this court's prior decision in *Administrative Office of the Illinois Courts v. State & Municipal Teamsters, Chauffeurs & Helpers Union, Local 726*, 167 Ill. 2d 180 (1995) (hereinafter, *AOIC*), I do not share this view. Any agreement with the IBEW must necessarily comply with the Illinois Constitution, this court's own rules, and this court's prior decisions—including *AOIC*. Nothing in today's order obligates this court to surrender its authority to the state or federal labor relations boards. I am frankly surprised that the dissenting justices would assume that a majority of this court would simply ignore its own jurisprudence and constitutional precepts.

---

[1]The complete results in the Cook County poll in which 187 surveys were mailed are: 124 in favor of unionization; 3 opposed; 4 additional votes in favor received after the due date; 1 vote in favor received without a signature card; 1 vote in opposition received without a signature card; 54 did not respond.

Justice Garman also expressed concern that without the enforcement mechanism of the labor board, court reporters, just as they are now, will be subject to the goodwill of this court in matters pertaining to employment. "And for this," Justice Garman notes, "they will have union dues deducted from their paychecks. I cannot believe that the court reporters will be happy with such a situation." I am certain Justice Garman is sincere in her belief about what will make the court reporters happy. Such concern, however, is unwarranted. The court reporters themselves may decide, through their collective-bargaining representative, what will make them happy and what is in their best interests.

With respect to the issue of funding, the dissenting justices question whether this court should assume a potentially large financial burden during a period of fiscal restraint. I have no doubt that, at the time of negotiations with the IBEW, funding will be an issue. To the extent negotiations result in a tentative agreement which would necessarily increase the court's budget, funding from the legislature would be a prerequisite to acceptance of the agreement. Today's order does not obligate this court to make financial commitments it cannot fulfill.

Finally, I must respond to the implicit suggestion in Justice Thomas' dissent that this court cannot, without abandoning principles of judicial independence, consider the views of outside sources in setting its administrative agenda and making its administrative decisions. Importantly, in cases which come before this court, judicial independence is paramount and cannot be compromised. See Ill. Const. 1970, art. II, § 1 (separation of powers clause). Our decisions must be—and are—free of external and extraneous influences, be it from the governor, our General Assembly, or any other public or private entity or person. In administrative matters, however, this court has actively sought out the views of outside sources. We

do this routinely in committee and commission appointments, rule changes, and judicial appointments. Whether court reporters should be allowed to bargain collectively is also an administrative matter and, therefore, outside views are both helpful and necessary in making an informed decision. Thus, to the extent members of this court relied on information from outside sources in reaching their decision to vote either for or against recognition of the IBEW, it was entirely proper to do so and does not mean that this court has abdicated its duty to maintain its independence as a coequal branch of government.

CHIEF JUSTICE McMORROW and JUSTICES KILBRIDE and RARICK join in this supporting opinion.

JUSTICE FREEMAN, dissenting:

Today's order will leave anyone who has taken the time to follow the historical arc of this court's consideration of unionization of judicial branch employees—including court reporters—bewildered. That historical arc began with *County of Kane v. Carlson*, 116 Ill. 2d 186 (1987), continued with both *Orenic v. Illinois State Labor Relations Board*, 127 Ill. 2d 453 (1989), and *Administrative Office of the Illinois Courts v. State & Municipal Teamsters, Chauffeurs & Helpers Union, Local 726*, 167 Ill. 2d 180 (1995) (hereinafter, *AOIC*), and now ends with the court's actions today. For that reason, it is impossible to comment upon today's order without understanding how the court's position on the matter has changed over time.

*County of Kane, Orenic & AOIC*

In *County of Kane*, this court concluded that "the inclusion of judicial branch employees within the [Labor Relations Board] Act does not by itself trench on the separation of powers principle or on the general administrative and supervisory authority granted by the Consti-

tution to the judicial branch." *County of Kane*, 116 Ill. 2d at 209. This holding opened the door to the possibility of the unionization of judicial branch employees. Two years later, in *Orenic*, this court made clear that the term "employer" for public labor law purposes had to be defined in view of separation of powers concerns and the workings of our unified court system. *Orenic*, 127 Ill. 2d at 476-77. At issue was whether counties were joint employers with the chief circuit court judges of certain nonjudicial court employees, *i.e.*, public defenders, bailiffs, *court stenographers*, and jury commissioners. *Orenic*, 127 Ill. 2d at 474-80. The counties argued for joint employer status, pointing to their role in funding the court system and setting salaries. *Orenic*, 127 Ill. 2d at 474-80. This court rejected the argument and held that the chief judges were separately the sole employer representatives, notwithstanding this court's direct authority over the judiciary. *Orenic*, 127 Ill. 2d at 476.

In *AOIC*, however, a majority of this court determined that it was this court, and this court alone, which stood as the employer of the court reporters. *AOIC*, 167 Ill. 2d at 188. In light of that holding, the court concluded that unionization of court reporters could not occur given the separation of powers concerns that stem from recognizing this court as the employer representative of the court reporters. *AOIC*, 167 Ill. 2d at 193. Specifically, the court stated, "[t]he [separation of powers] problems we discern relate not to collective bargaining itself, but to the large degree of control that would be exercised over this court by an agency of the executive branch." *AOIC*, 167 Ill. 2d at 197.

I dissented from the decision in *AOIC*. After considering the issues raised and the precedent of this court, I concluded that the unionization of court reporters was possible and would not contravene separation of powers principles if the chief judges of the circuit courts were

recognized as the court reporters' employer representatives. *AOIC*, 167 Ill. 2d at 208 (Freeman, J., dissenting).

## The Court's Present Actions

Today's order, which "voluntarily" recognizes the International Brotherhood of Electrical Workers as the bargaining representative for court reporters in Cook County, is, on its face, inconsistent with *AOIC*. The holding in *AOIC* was clear in that this court was held to be the employer representative for the court reporters and that separation of powers problems arose within the context of that relationship, *i.e.*, that an arm of the executive branch, the Labor Relations Board, would touch on judicial branch administration. *AOIC*, 167 Ill. 2d 196-98. Yet, in today's order, the court does exactly what the court in *AOIC* said it could not do, that is, recognize a union representative given this court's status as sole employer of the court reporters. In light of my position in *AOIC*, one would expect me to approve of the court's present actions. I regret that I am unable to do so. The holding in *AOIC* represents the law in this state until it is overruled, and today's order does not explicitly overrule it. Today's order acts in spite of the opinion. The order does not explain how the separation of powers concerns identified by the court in *AOIC, i.e.,* "the large degree of control that would be exercised over this court by an agency of the executive branch" (*AOIC*, 167 Ill. 2d at 197), have been eradicated in the time between the issuance of that opinion and now. For example, under the Illinois Labor Relations Act, the Labor Relations Board serves to resolve disputes that arise under any collective-bargaining agreement. The court's opinion in *AOIC* holds that a separation of powers problem arises when the Labor Relations Board is put in such a position *vis-à-vis* this court. The Labor Relations Board, an agency of the executive branch of government, would still hold a position of authority over this court even though the recogni-

354

tion of union representation for court reporters comes from this court in voluntary fashion. Thus, the main concern of the court in *AOIC* in reaching its decision to deny union representation to the court reporters (see *AOIC*, 167 Ill. 2d at 195-97) is still present today.

The opinion written in support of today's order barely acknowledges the holding of *AOIC* and the implications that holding has on today's actions. Instead, the statement of support speaks of the voluntariness of the court's actions, as if to suggest that by doing something "voluntarily," any former concerns regarding the separation of powers no longer exist. Unless, by using the term "voluntary," the supporting justices mean to suggest that the recognition given today will fall outside the purview of the Illinois Labor Relations Act and that the Act will have no application to the court's dealings with the unionized court reporters. If this is so, I wonder what benefits of unionization exist if the Labor Relations Act—an Act whose purpose is, *inter alia*, to regulate labor relations between public employers and employees with respect to collective bargaining—is inapplicable to court reporters. I also wonder whether those court reporters who voted for unionization would do so again if this court had made known the fact that it was going to give them unionization without benefit of the same Act which applies to those with whom they "work side by side in the courtrooms," *i.e.*, court clerks, probation officers, deputy sheriffs, police officers, and public defenders. See 211 Ill. 2d at 349 (Fitzgerald, J., writing in support, joined by McMorrow, C.J., and Kilbride and Rarick, JJ.). Today's order and the accompanying statement of support do not speak to how dispute resolution will be handled in the absence of the Labor Relations Board. If the Labor Relations Board has no applicability in this matter because of separation of powers problems, then some other type of neutral impasse-resolution body must be formed by this

court in order to proceed with reaching the "agreement" spoken to in the statement of support. See 211 Ill. 2d at 349 (Fitzgerald, J., writing in support, joined by McMorrow, C.J., and Kilbride and Rarick, JJ.)

I further note that the statement in support alludes to the constitutional questions which may be implicated by the recent amendments to the Court Reporters Act, stating that "those questions are not now before us and should be left to a time when they are." See 211 Ill. 2d at 348 (Fitzgerald, J., writing in support, joined by McMorrow, C.J., and Kilbride and Rarick, JJ.) I question whether it is wise for this court to go forth with recognition in this manner without even knowing whether its actions comport with our constitution. As it is, the court today has seemingly ignored the separation of powers problems that this court has previously identified in a published opinion.

In light of the foregoing, I believe that if this court is serious about unionization of the court reporters, it should speak to these issues and reconcile its actions with its decision in *AOIC*. It is not enough for those in support to say that they "do not share" in the view that today's action is inconsistent with *AOIC*. See 211 Ill. 2d at 349 (Fitzgerald, J., writing in support, joined by McMorrow, C.J., and Kilbride and Rarick, JJ.). The justices in support state that "any agreement with the IBEW must necessarily comply with the Illinois Constitution, this court's own rules, and this court's prior decisions—including *AOIC*." See 211 Ill. 2d at 349 (Fitzgerald, J., writing in support, joined by McMorrow, C.J., and Kilbride and Rarick, JJ.). Given the statement of support's utter lack of any of the substantive details today's action would appear to require, my colleagues should not be surprised that the dissenting justices "would assume that a majority of this court would simply ignore its own jurisprudence and constitutional precepts." See 211 Ill.

2d at 349 (Fitzgerald, J., writing in support, joined by McMorrow, C.J., and Kilbride and Rarick, JJ.). I, for one, assume nothing—I have reviewed our precedent and do not understand how the "formal agreement" spoken of in today's order will be reached in light of that precedent. In my dissent in *AOIC*, I explained how there were no separation of powers concerns when the correct employer representative, the 22 chief circuit judges, were recognized as the court reporters' employer representative for purposes of collective bargaining. It is unclear from the court's actions today whether the chief judge of Cook County will assume that role. Equally unclear is the applicability of the Illinois Labor Relations Act to union recognition and what role, if any, the Labor Relations Board will play in this. Any voluntary action that we may take in this matter should at least be seen to comport with our case law. If the court does not provide any legal reasoning to support what looks like just the latest in a series of *volte-faces* in this area of the law, it does not matter how honest the belief may be held that union recognition is proper. And while I may know that my colleagues' motivations are entirely well-meaning in this endeavor, the fact remains that the court leaves itself open to suggestions that considerations other than those of a legal nature are at play in its decisionmaking process when it acts in a manner that stands in so stark a contrast to its own jurisprudence.

Moreover, even if I could put aside the above concerns, I would still find myself unable to join in today's order. I disagree with beginning the process of unionization of the court reporters in the piecemeal fashion outlined in the order. If this court is going to recognize the power of court reporters to engage in collective bargaining, then it should do so in uniform fashion throughout the entire state, not just in Cook County. Indeed, *AOIC* demonstrates that interest for unionization was strong enough for *statewide* litigation to be commenced. My colleagues

who voted in favor of today's action do so because they believe recognition is "proper and fair." See 211 Ill. 2d at 348 (Fitzgerald, J., writing in support, joined by McMorrow, C.J., and Kilbride and Rarick, JJ.) If such an action is "proper and fair" for our employees in the first judicial district, then it necessarily must also be "proper and fair" for all of our other employees in the rest of the judicial districts that comprise the state. Will any benefits secured by union negotiation for Cook County court reporters be given to the rest of our court reporters who are outside of Cook County? If so, "fair share" concerns may arise. See 5 ILCS 315/6(e) (West 2002). In my view, the better approach to the question of unionization would be for the court to defer acting upon it until the court can set forth a definitive statewide plan so that all court reporters throughout the State of Illinois can be given the opportunity to enjoy the benefits of union membership. Unfortunately, the court's unwillingness to defer its action until a comprehensive statewide plan for unionization is in place is another aspect of the decision which invites criticism.

Finally, given the constraints on our own court budget and on state finances in general, I do not believe that the time is right for this type of voluntary action on our part. Justice Thomas correctly notes the financial concerns which are at issue in an undertaking of this size and scope. Today's order suggests that this court will be administering to court reporters in two distinct ways—one system designed for the court reporters who are union members in Cook County and another system for the court reporters in the rest of the state. The operating costs of such a dual system will, without question, be more than what the costs are now under a singular system, particularly if the court will have to create a dispute-resolving alternative to the Labor Relations Board. At a time when other state agencies and depart-

ments are engaging in belt-tightening, we too should be doing all that we can to ensure fiscal responsibility. I remind my colleagues that we recently pledged to do just that in *Jorgensen v. Blagojevich*, 211 Ill. 2d 286, 316 (2004):

"In reaching this result [judiciary's constitutional entitlement to cost-of-living adjustments as part of a judicial salary], we acknowledge that substantial budgetary challenges currently confront the Governor and the General Assembly. The adverse economic conditions facing so many of our fellow citizens have taken an inevitable toll on the state's treasury. Revenues are not keeping pace. Despite efforts by the Governor and legislature, shortfalls persist. We do not mean to diminish the seriousness of the situation or appear insensitive to the difficulties faced by our coordinate branches of government. Those difficulties are undeniable, and we are highly cognizant of the need for austerity and restraint in our spending. As administrators of the judiciary, we make every effort to economize whenever and however we can."

In light of the above, I believe prudence dictates that we wait before adding more expenses to our already overburdened budget. Those in support readily acknowledge that funding is a concern. See 211 Ill. 2d at 350 (Fitzgerald, J., writing in support, joined by McMorrow, C.J., and Kilbride and Rarick, JJ.) I cannot help but feel that today's voluntary action—coming as it does at a time when the state's financial condition has caused many in both the private sector and in government to scale back—leaves our words in *Blagojevich* ringing hollow. Even worse, it may lead some taxpayers to believe that we did not mean what we said in *Blagojevich*. Such a reaction is hardly in this court's best interests.

### Conclusion

While a member of this court, I supported the notion of unionization for court reporters, as my dissent in *AOIC* demonstrates. I therefore deeply regret having to vote against today's actions. However, I cannot turn a blind

eye to the fact that today's action is wholly inconsistent with this court's precedent. I also cannot overlook different treatment for similarly situated court employees on the basis of where they live in our state. Nor can I ignore the excess costs this will add to the budget in these times of financial crisis. For these reasons, I respectfully dissent.

JUSTICE THOMAS, also dissenting:

Today's announcement sets a clear and dangerous precedent. I deeply regret the process that led to today's decision, and I therefore must dissent.

The story that led to today's announcement begins in 1995, with this court's decision in *Administrative Office of the Illinois Courts v. State & Municipal Teamsters, Chauffeurs & Helpers Union, Local 726*, 167 Ill. 2d 180 (1995) (hereinafter, *AOIC*). In that case, this court addressed whether the Public Labor Relations Act can be applied to Illinois court reporters. In holding that it could not, we stated that "this court must be regarded as an employer of the court reporters." *AOIC*, 167 Ill. 2d at 188. As it turns out, this holding was itself dispositive on the question presented, as "judicial power under the Illinois Constitution includes not only the power to hear and decide cases, but also general administrative and supervisory authority over the courts of this State." *AOIC*, 167 Ill. 2d at 192. To be sure, article VI, section 18, of the Illinois Constitution authorizes the legislature to set salaries for and provide for the appointment and removal of certain judicial branch employees. Ill. Const. 1970, art. VI, § 18. That section does not mean, however, that the legislature "is also free to impose on this court a system of collective bargaining that would violate separation of powers principles." *AOIC*, 167 Ill. 2d at 198. Stated differently, section 18 does not authorize the legislature to "freely impose other requirements on this court that would reduce the independence of the judiciary

as a separate branch of government." *AOIC*, 167 Ill. 2d at 199. Significantly, "[t]he union representation proceeding at issue here would give rise to a continuing intrusion on virtually every aspect of the employment relationship existing between this court and the official court reporters." *AOIC*, 167 Ill. 2d at 200. Such an infringement "threatens a systemic rather than an incidental interference with court operations." *AOIC*, 167 Ill. 2d at 200. Accordingly, "application of the Public Labor Relations Act to persons directly employed by this court would violate the separation of powers doctrine." *AOIC*, 167 Ill. 2d at 193.

Now, the *AOIC* decision should have put the matter to rest, at least as far as the legislature was concerned. But it did not. On the contrary, the legislature recently revived the unionization question by enacting a series of amendments to the Court Reporters Act (705 ILCS 70/1 *et seq.* (West 2002)). Under those amendments:

> "The Supreme Court *shall collectively bargain* over wages, hours, and terms and conditions of employment of all persons employed as court reporters in this State. The Supreme Court *shall recognize* an exclusive bargaining representative of persons employed as court reporters in this State, if that representative makes a showing, through an election or otherwise, that it represents a majority of the court reporters, in accordance with procedures for verifying majority status established by the Court." (Emphasis added.) 705 ILCS 70/8.2 (as amended by Pub. Act 93—89, eff. July 2, 2003).

In addition, the amendments define the matters that are subjects to collective bargaining (all matters concerning wages, hours, and other terms and conditions of employment); compel this court to consult with the court reporters concerning acceptable arbitrators; and compel this court to appoint *and compensate* a roster of arbitrators.

To its credit, the legislature was very candid from the

start, openly admitting that Public Act 93—89 was designed to overrule this court's decision in *AOIC*. Public Act 93—89 began its life as House Bill 1088. Unlike Public Act 93—89, House Bill 1088 included a "Findings and Declarations" section. That section provided:

"Sec. 2.5. Findings and declarations; court reporters. The General Assembly finds and declares:

(1) It is the public policy of the State of Illinois and the intent of the General Assembly that State employees, including the Illinois official certified court reporters, are granted collective bargaining rights as provided in this Act.

(2) The Illinois Supreme Court in the case of AOIC v. Teamsters 726 ruled that the Illinois Public Labor Relations Board could not assert jurisdiction over the Illinois official certified court reporters because the Supreme Court is their co-employer together with the Chief Judges of each judicial circuit.

(3) As a result of the Supreme Court's decision, *the Illinois official certified court reporters have been denied the labor rights afforded all other State employees*, including the rights to organize, to obtain recognition of their chosen collective bargaining representative, and to negotiate with respect to the wages, terms, and conditions of their employment.

(4) *The General Assembly intends to create a statutory framework to allow Illinois official court reporters to enjoy the same collective bargaining and other labor rights granted to other public employees.*" (Emphases added.) 93d Ill. Gen. Assem., House Bill 1088, 2003 Sess.

Speaking even more candidly, one Senator described the amendments as an attempt to *"override or skirt* the Supreme Court's decision." (Emphasis added.) 93d Ill. Gen. Assem., Senate Proceedings, May 31, 2003 (statements of Senator Cronin). Thus, the express purpose of the amendments at issue was to do exactly what this court said *could not be done* in *AOIC*—namely, bind this court to engage in collective bargaining.

But the story does not end here, either. In 2001, Local 1220 of the International Brotherhood of Electrical

Workers, AFL-CIO (IBEW), asked this court to voluntarily recognize the IBEW as the exclusive-bargaining representative for Illinois court reporters. That request was denied. See No. 91949 (November 19, 2003) (order). Four weeks later, and this time armed with Public Act 93—89, the IBEW filed a new action against this court to compel compliance with the amended Court Reporters Act. That request was denied, as well. See No. 97542 (May 13, 2004) (order). Meanwhile, the legislature introduced yet another series of amendments, this time to the Illinois Public Labor Relations Act (see 93d Ill. Gen. Assem., House Bill 5445, 2004 Sess.). Like Public Act 93—89, House Bill 5445 was a direct assault on this court's decision in *AOIC*.

Thus, less than 10 years after unambiguously declaring that matters relating to the employment of court reporters fall solely and squarely within this court's administrative authority, this court was facing a blitz of both legislation and litigation designed to nullify the separation of powers principles outlined *AOIC*. Even worse, the purpose of that blitz was not to prevail in the courtroom—the *AOIC* decision foreclosed any possibility of that. Rather, the purpose was to exert so much political and legislative pressure that the court had no choice but to "voluntarily" recognize the court reporters union. And rather than stand up to that pressure, we capitulated.

The message of *AOIC* was that this court, and only this court, would set the agenda with respect to the unionization of court reporters. Today's lesson is that, with enough legislative and political pressure, this court's agenda can be hijacked. This court has, on previous occasions, considered and rejected the unionization of Illinois court reporters. Those prior decisions were based on careful policy considerations and were not undertaken lightly. Unfortunately, this court now seems willing to let politics, rather than precedent, set the administrative agenda.

It is worth noting that today's action strikes a major blow not only to this court's independence but also to this court's budget. With "voluntary" recognition comes a tremendous financial obligation. There is no question that this court's budget is strapped. Do we even have the hundreds of thousands of dollars that it will take to administer a collective-bargaining scheme? Will the legislature fund it? What cuts will we have to make? These are real concerns, with real consequences for the judicial branch. Sadly, this court let itself be backed into a corner without ever fully considering the practical implications.

We have said that "it is the court's solemn duty to protect the judicial power from legislative encroachment and to preserve the integrity and independence of the judiciary." *People v. Felella*, 131 Ill. 2d 525, 539 (1989). To that end, this court has held that the legislature is powerless to enact laws " 'solely concerning court administration or the day-to-day business of the courts.' " *People v. Williams*, 124 Ill. 2d 300, 306 (1988), quoting *People v. Walker*, 119 Ill. 2d 465, 475 (1988). Likewise, "the legislature *is without authority* to interfere with 'a product of this court's supervisory and administrative responsibility.' " (Emphasis added.) *People v. Joseph*, 113 Ill. 2d 36, 45 (1986), quoting *People v. Jackson*, 69 Ill. 2d 252, 259 (1977). Were it otherwise, "the judiciary would be nothing more than an extension of the legislature." *Felella*, 131 Ill. 2d at 538-39.

These are not mere platitudes. As a court, we have an obligation to protect both our institutional independence and the supremacy of the decisions we render, *especially* where those decisions, like *AOIC*, define the inherent powers of the judicial branch. Today's decision weakens us. It tells the legislature and the special interests that we are not strong, and that, with enough pressure, we will give in.

In closing, let me emphasize that my displeasure lies not with the "voluntary" recognition *per se*, but with the process that led to that decision. Had this court, on its own initiative and based on a change in circumstance, elected to revisit the court reporters question, that would have been fine. But that is not what happened. What happened is that the legislature and the union refused to back down, while we backed down all too easily. This is our legacy.

I dissent.

JUSTICE GARMAN, also dissenting:

In 1995, this court held that it was an employer of official Illinois court reporters and that, based upon well-established principles of separation of powers, the Public Labor Relations Act (Act) (5 ILCS 315/1 *et seq.* (West 2002)) could not be applied to this court. *Administrative Office of the Illinois Courts v. State & Municipal Teamsters, Chauffeurs & Helpers Union, Local 726*, 167 Ill. 2d 180 (1995) (hereinafter, *AOIC*). In an avowed effort to skirt our decision in *AOIC*, the General Assembly amended the Court Reporters Act (705 ILCS 70/1 *et seq.* (West 2002)), purporting to require this court to recognize a bargaining representative for the court reporters and to bargain collectively with that representative over wages, hours, and terms and conditions of employment. 705 ILCS 70/8.2 (as amended by Pub. Act 93—89, eff. July 2, 2003). The amendments also provided for nonbinding arbitration and required this court to establish procedures for the arbitration of any disputes. 705 ILCS 70/8.5 (as amended by Pub. Act 93—89, eff. July 2, 2003). We have since been the recipient of requests from Local 1220 of the International Brotherhood of Electrical Workers, AFL-CIO (IBEW), to voluntarily recognize it as the exclusive bargaining representative for the court reporters. Those requests were denied.

Today, in an ironic twist, this court has itself done what we said in *AOIC* could not be done without diluting the independence of the judiciary. In choosing to recognize the IBEW, we have surrendered a measure of our constitutional supervisory and administrative authority over the courts of this state. Ill. Const. 1970, art. VI, § 16. This decision is ill-advised, both from a legal standpoint and for practical reasons. As Justice Freeman correctly notes in his dissent, it is unclear whether the Act will be applicable to any collective bargaining with the court reporters and, if so, what, if any, role the State Labor Relations Board (State Board) will play. As the executive agency responsible for adjudicating disputes between employers and their union employees, the State Board plays a crucial role in public labor relations in Illinois. We said in *AOIC* that the State Board could not constitutionally exercise jurisdiction over this court with respect to its relationship to the court reporters. Is that now to change? And, if so, how can such a change be justified given the very clear constitutional concerns identified in our *AOIC* decision? The fact that we "voluntarily" recognize the IBEW has no magical significance. We still face the same limitations imposed by our constitution's separation of powers clause. Ill. Const. 1970, art. II, § 1. Thus, if we voluntarily submit to the jurisdiction of the State Board, we will be placing this court in violation of the constitution. Surely, this is not what today's order contemplates. If, however, the State Board is not to be involved, how will any disputes with the IBEW be resolved? And, who will be responsible for administering such a system? For this court to be in control of such matters suggests a significant conflict of interest. Yet, some kind of alternative dispute-resolution mechanism must be created. Today's order answers none

of these questions, leading me to the inescapable conclusion that we have put the cart before the horse. We are going into this blindly without knowing how it will be handled or what the consequences may be.

I am further disturbed by the disregard for our legal precedent that is demonstrated by today's decision. In *AOIC*, we said that we could not, consistent with separation of powers principles, subject ourselves to the jurisdiction of the State Board. This certainly at least implied that recognition of a bargaining representative for the court reporters was not possible under Illinois law. Instead of explicitly overruling *AOIC* or at least explaining the departure from that decision, today's order simply ignores it. The holding in *AOIC* has been the law of our state for nearly 10 years. The doctrine of *stare decisis* "is the means by which courts ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 510 (1994). Prior decisions should not be overruled absent "good cause" or "compelling reasons" to do so. *Vitro v. Mihelcic*, 209 Ill. 2d 76, 82 (2004). No such justification has been offered in today's order.

Given the inability of any state agency to constitutionally exercise jurisdiction over this court in labor relations matters, it is clear that any commitment made by us in a collective-bargaining agreement pursuant to our voluntary recognition of the IBEW cannot be enforced. Given that fact, how will the court reporters be better off with a union representative than without? They will have no way to enforce their rights under the collective-bargaining agreement. Any grievance procedure established in the agreement will be useless without an enforcement mechanism. What it boils down to is that the court reporters, just as they are now, will be subject

to the goodwill of this court as their employer in all matters pertaining to their employment. And for this, they will have union dues deducted from their paychecks. I cannot believe that the court reporters will be happy with such a situation. I note that we have not taken any steps to learn why our court reporters in Cook County are evidently so dissatisfied that they desire unionization. If they feel they are being treated unfairly, we should find out why and try to work with them to resolve any legitimate concerns they may have.

I am also concerned about the potential high cost of implementing today's order. I question whether we should be undertaking such a large financial burden during these difficult economic times, especially when we have no idea at present what such a system will require, what the cost will be, or whether we can even afford to make the financial sacrifice that will be demanded. We certainly do not have sufficient funds in our present budget to fund an adequate system of collective bargaining. Today's order states that it is contingent on our receiving "additional appropriations." In our recent decision in *Jorgensen v. Blagojevich*, 211 Ill. 2d 286, 316 (2004), we noted the budget crisis that exists in the state and the difficult decisions faced by the governor and the legislature in meeting, with limited financial resources, the needs of our citizens. We noted that "we are highly cognizant of the need for austerity and restraint in our spending. As administrators of the judiciary, we make every effort to economize whenever and however we can." In today's economy, it is unwise to ask the taxpayers to give us large sums of money to fund what is essentially, at this point, an experiment. At the very least, we should have some idea of the cost and some assurance that the benefits to be gained justify that cost.

Finally, I wish to make it clear that I do not question

the good intentions of my colleagues in the majority. However, I strongly believe that today's action is ill-advised from a constitutional standpoint and from a practical standpoint. For those reasons, I dissent.