No. 01–175. WILLIAMS, JUDGE, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, ET AL. v. UNITED STATES. C. A. Fed. Cir. Certiorari denied.

JUSTICE BREYER, with whom JUSTICE SCALIA and JUSTICE KENNEDY join, dissenting.

The Ethics Reform Act of 1989 provides for automatic annual adjustments in judicial pay to take account of inflation. In each of fiscal years 1995, 1996, 1997, and 1999, Congress included language in appropriations legislation that prevented the Ethics Act adjustments from taking effect for that fiscal year. The petitioners in this case, federal judges sitting when the Ethics Act became law, claim that the latter legislation violates the Constitution's Compensation Clause. In my view the Compensation Clause question is both difficult and important. I would grant certiorari and hear this case.

I

On January 1, 1990, the Ethics Reform Act (Ethics Act or Act) took effect as law. Pub. L. 101–194, 103 Stat. 1716. Insofar as that statute applied to federal judges it accomplished two important objectives. First, it strictly limited the amount of outside income that any judge could earn. It forbade the receipt of honoraria, speaking or lecture fees, payments for articles, or other income earned other than by teaching or writing books. And it imposed a dollar limit (now just over $21,000) on the income a judge could earn through classroom teaching. 5 U. S. C. App. §§ 501–502.

Second, the Act sought to maintain real judicial compensation at a nearly constant level. The Quadrennial Commission on Executive, Legislative, and Judicial Salaries had told Congress that a continuous inflation-driven reduction in the real level of judicial salaries, at a time when most other real salaries in America had

remained constant or increased, was "threatening to diminish the quality of justice in this country . . . ." Report of 1989 Commission on Executive, Legislative and Judicial Salaries, Fairness for our Public Servants 27 (1988). And the Congressional Bipartisan Task Force on Ethics had added that "[f]ederal judges are resigning at a higher rate than ever before." 135 Cong. Rec. 30752 (1989). Failure to protect against the negative impact of inflation, the task force stated, was "the single, most important explanation" for the increasing disparity between the salaries of high-level Government officials and comparable positions in the private sector. *Id.*, at 30753. Hence, the Act focused on inflation, assuring federal judges (as well as Members of Congress and high-level Executive Branch officials) that their real salaries, compared to those of the average worker, would decline only slightly, if at all.

The Act provided this assurance as follows: First, it said that each year "each [judicial] salary rate . . . shall be adjusted by an amount . . . as determined under section 704(a)(1) . . . ." 28 U. S. C. § 461(a)(1) (1994 ed.). Second, it provided in § 704(a)(1) that the adjustment amount would equal the quarterly percentage set forth in the Employment Cost Index (a measurement of change in private sector salaries published by the Bureau of Labor Statistics) minus one-half of one percent with a ceiling of five percent. *Ibid.* Third, it said that this adjustment "shall" take place whenever there was a similar adjustment in the salary of federal civil servants under "section 5303 of [Title 5]." 5 U. S. C. § 5318. Fourth, it made clear that this latter adjustment would take place annually and automatically unless the President determined that there was either (1) a "national emergency" or (2) "serious economic conditions affecting the general welfare." § 5303(b)(1).

The Act mandates adjustments to judicial salaries; the adjustments are mechanical and precise; and they are to take place automatically, for they are tied to the adjustments provided to General Schedule employees which themselves are automatic but for the two possible exceptions. These features of the law assured federal judges, as I have said, that their real salaries would stay approximately level unless the real salaries of the average private sector worker or those of the typical civil servant declined significantly as well.

The adjustments for which the Ethics Act provided took effect as required by the Act in fiscal years 1991, 1992, 1993, and 1998. In fiscal year 1994, the President applied the special circumstance exception, invoking "serious economic conditions" (namely, huge budget deficits) as a basis for denying General Schedule employees an adjustment, and, consequently, federal judges received no adjustment in their salaries either. In each of fiscal years 1995, 1996, 1997, and 1999, however, the adjustment in the salaries of General Schedule employees took effect. But the related adjustment in the salaries of federal judges did not take effect. That is because, in each year, Congress included in its appropriations legislation language specifying that, other laws to the contrary notwithstanding, the salaries of Members of Congress, certain high-level Executive Branch employees, and federal judges would not be adjusted. Pub. L. 103–329, § 630(a)(2), 108 Stat. 2424; Pub. L. 104–52, § 632, 109 Stat. 507; Pub. L. 104–208, § 637, 110 Stat. 3009–364; Pub. L. 105–277, § 621, 112 Stat. 2681–518.

In 1997, a group of federal judges, all members of the Federal Judiciary prior to 1989, filed this lawsuit against the United States. The judges argued that the first three special "blocking laws" diminished their compensation in violation of Article III's command. The District Court agreed and granted summary judgment in the judges' favor. The same judges then filed a similar suit based on the fourth blocking law, which had now taken effect, and the District Court granted them summary judgment on this suit as well. The United States appealed, and the cases were consolidated. The Court of Appeals reversed in a 2-to-1 panel decision. 240 F. 3d 1019 (CA Fed. 2001). The judges now seek certiorari.

## II

The judges argue that the appropriations legislation blocking the Ethics Act adjustments violates the literal language of the Compensation Clause and runs contrary to its basic purposes. In respect to the language, they point out that the Clause says that judges "shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U. S. Const., Art. III, § 1. The Ethics Act, they say, sets forth the level of "compensation" that judges "shall . . . receive" at a "stated time," *i. e.*, each year. The subsequent appropriations legislation "diminished" that fixed

"compensation" by removing the previously legislated adjustment. And it did so during the plaintiff judges' "continuance in office."

Moreover, the judges argue, the blocking statutes represent precisely the kind of legislation that the Compensation Clause was designed to prohibit. The Founders wrote the Compensation Clause in order to help ensure "complete independence of the courts of justice." The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton). As Hamilton explicitly stated: "Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support." *Id.*, No. 79, at 472. A "power over a man's subsistence," Hamilton added, "amounts to a power over his will." *Ibid.* (emphasis deleted).

Moreover, when the Founders considered the Constitution's specific provisions, they took inflation into account. Hamilton, fully aware of then-prevalent inflation, wrote that "fluctuations in the value of money and in the state of society rendered a fixed rate of compensation in the Constitution inadmissible." *Id.*, at 473. For that reason, he insisted that the Constitution "leave it to the discretion of the legislature to vary its provisions in conformity to the variations in circumstances." *Ibid.* But once the legislature has chosen to vary a provision, he added, the Compensation Clause "put[s] it out of the power of that body to change the condition of the individual for the worse." *Ibid.* The reason is that a judge must "be sure of the ground upon which he stands, and . . . never be deterred from his duty by the apprehension of being placed in a less eligible situation." *Ibid.* In a nutshell, the Founders created a one-way compensation ratchet because they believed that permitting the legislature to diminish judicial compensation would allow the legislature to threaten judicial independence.

Three examples will help illustrate how, in the judges' view, the appropriations legislation undermines these basic Compensation Clause objectives:

*Example One* assumes that Congress has enacted a statute taking effect on January 1, 2000, specifying that federal district court salaries for the next five years shall be paid according to the following schedule:

| | |
|------|----------|
| 2000 | $150,000 |
| 2001 | $150,000 |
| 2002 | $150,000 |
| 2003 | $150,000 |
| 2004 | $150,000 |

*Example Two* assumes that Congress, believing that inflation is likely to occur, has enacted a statute taking effect on January 1, 2000, specifying that federal district court salaries for the next five years shall be paid according to the following schedule:

| | |
|------|----------|
| 2000 | $150,000 |
| 2001 | $160,000 |
| 2002 | $170,000 |
| 2003 | $180,000 |
| 2004 | $190,000 |

*Example Three* is a simplified version of the present case. It assumes a statute that specifies a mechanically determined adjustment for inflation (yielding a, b, c, and d dollars) added on to the fiscal year 2000 salary each year according to the following table:

| | |
|------|-------------------------|
| 2000 | $150,000 |
| 2001 | $150,000 + a |
| 2002 | $150,000 + a + b |
| 2003 | $150,000 + a + b + c |
| 2004 | $150,000 + a + b + c + d |

Example One presents circumstances where Congress could not subsequently (say, in 2003) reduce the pay of previously sitting federal judges below the amount previously specified for that year ($150,000). But what about Example Two and Example Three? It is difficult to see any difference between a later statute, enacted, say, in 2003, that removes Example Two's $10,000 increase due in 2004, and a similar statute that removes Example Three's increase of mechanically determined amount "d." Those two examples would seem virtually identical from a constitutional point of view.

But does the Compensation Clause distinguish Example One from Examples Two and Three? The lower court answered this question affirmatively. Its answer assumes that the Constitution forbids only a reduction in the nominal dollar rate of pay that

a judge actually has earned for at least some minimal period of time.

The judges concede that such a reading is possible logically. But they point out that that reading, in significantly restricting the protective scope of the Compensation Clause, would mock Hamilton's claim that the Constitution (while granting to Congress the power to decide when to *increase* a judge's nominal pay) "put[s] it out of the power" of Congress "to change the condition of the individual for the worse." *Ibid.* That is because the three examples are virtually identical in terms of the Compensation Clause's basic purposive focus: *a judge's reasonable expectations.* A sitting judge has no greater, and no lesser, reason to believe he will receive the amounts provided in Examples Two and Three than the amount provided in Example One. Assuming in each case that a statute already in effect has similarly determined, fixed, and mandated the figures listed in the schedule, a judge similarly will expect to receive the salary that the statute mandates. And any subsequent reduction in the amounts contained in any of the three statutes would similarly diminish the judge's compensation below the level that the law had previously entitled that judge to expect. Cf. *United States* v. *Hatter,* 532 U. S. 557, 585 (2001) (SCALIA, J., concurring in part and dissenting in part) (arguing that repeal of judges' exemption from Medicare tax constituted diminishment in compensation because judges "had an employment expectation of a preferential exemption from taxation . . ."); *ibid.* ("This benefit Congress took away, much as a private employer might terminate a contractual commitment to pay Medicare taxes on behalf of its employees"). Moreover, the expected level here is a level that does not increase a judge's real salary; it simply keeps that real salary from being reduced.

The federal appeals court majority did not reject this argument directly on the merits. Rather, it wrote that this Court had rejected the argument in *United States* v. *Will,* 449 U. S. 200 (1980), a unanimous decision, and it did not believe it could reopen the issue. 240 F. 3d, at 1035. In *Will,* the Court considered "when, if ever, . . . the Compensation Clause prohibit[s] the Congress from repealing salary increases that otherwise take effect automatically pursuant to a formula previously enacted." 449 U. S., at 221. The Court held that Congress could block a "cost-of-living" increase due judges (under pre-existing law) because the blocking legislation took effect in the fiscal year prior to the year

in which the increase would become payable. And the Court wrote that "a salary increase 'vests' . . . only when it takes effect as part of the compensation due and payable to Article III judges." *Id.*, at 229. This language and holding, in the Court of Appeals' view, distinguishes Example One from Examples Two and Three, offering protection in Example One, but not in either of the latter two examples.

The judges, however, offer a strong argument distinguishing *Will* in terms of the Compensation Clause's basic, expectations-related purpose. *Will* involved a set of interlocking statutes which, in respect to future cost-of-living adjustments, were neither definite nor precise. The statute providing for judicial cost-of-living adjustments, like the statute now before us, tied those adjustments to adjustments provided others in the civil service. But the civil service statute, unlike the comparable statute here before us, was imprecise as to amount and uncertain as to effect. The *Will* statutes required the President to appoint an adjustment agent. The agent was to compare salaries in the civil service with those in the private sector and then recommend an adjustment to an Advisory Committee. Subsequently, the Committee would make its own recommendation to the President, accepting, rejecting, or modifying the agent's recommendation as the Committee thought desirable. The President would have to accept the Committee's recommendation—unless he determined that national emergency or special economic conditions warranted its rejection. But that recommendation would not take effect as law if either House of Congress rejected it. See *id.*, at 203–204.

Put in terms of the Compensation Clause's basic purpose, the judges argue that the *Will* statutes created a series of hurdles that prevented those statutes from creating a firm judicial expectation that the statutes' potential beneficiaries, *e. g.*, sitting judges, would in fact receive any inflation-compensating adjustment. Neither did the statutes provide for calculation of any such adjustment in a mechanical way.

The judges add two further subsidiary distinctions: (1) The Ethics Act, unlike the statutes in *Will*, simultaneously eliminated other (outside) income that judges had previously received, 5 U. S. C. App. §§ 501–502; and (2) the Ethics Act, unlike the statutes in *Will*, was directly intended to protect judges from "riders to appropriations bills to deny them COLAs when other Federal employees receive theirs." 135 Cong. Rec., at 30753.

The judges recognize that the Ethics Act does not fix salaries quite as definitively as hypothetical Example Three suggests. That is because the Act's adjustment will not take place if the President determines that there exists either a "national emergency" or "serious economic conditions affecting the general welfare," and then reduces or eliminates General Schedule salary adjustments accordingly. But these circumstances, they argue, are defined precisely enough and are uncommon enough not to affect expectations significantly. In any event, that, according to the judges, is the question that this Court must decide—whether the 1989 statute is sufficiently precise and definite to have created an "expectation" that the Compensation Clause protects. Cf. *Boehner* v. *Anderson*, 30 F. 3d 156 (CADC 1994) (finding equivalent of such "vesting" for purposes of the Twenty-seventh Amendment in Ethics Act's adjustment provision as it applied to Members of Congress).

In my view, the Court in *Will* did not focus on this question. To read that opinion as the lower court read it would render ineffectual any congressional effort to protect judges' real compensation, even from the most malignant hyperinflation, Hamilton's views to the contrary notwithstanding. Indeed, that reading would permit legislative repeal of even the most precise and definite salary statute—any time before the operative fiscal year in which the new nominal salary rate is to be paid. I very much doubt that the Court in *Will* intended these consequences.

The Government alternatively claims that § 140 of a fiscal year 1982 appropriations bill, Pub. L. 97–92, 95 Stat. 1200, provides a separate basis for rejecting the judges' claim. I do not see how that is so. Section 140 provides in relevant part:

> "Notwithstanding any other provision of law . . . none of the funds appropriated by this joint resolution or by any other Act shall be obligated or expended to increase, after the date of enactment of this joint resolution, any salary of any Federal judge or Justice of the Supreme Court, except as may be specifically authorized by Act of Congress hereafter enacted."

This provision refers specifically to federal judges, and it imposes a special legislative burden upon their salaries alone. The singling out of judges must throw the constitutionality of the provision into doubt. *Hatter, supra,* at 564 (striking down as un-

constitutionally discriminatory the imposition of a Social Security payroll tax upon a small group of federal employees consisting "almost exclusively of federal judges"). Regardless, the Government fails to explain how, in light of the fact that the Ethics Act "specifically authorized" (indeed mandated) future adjustments in judicial pay, the language of § 140 (enacted in 1981) could make a legal difference. The Government adds that Congress reenacted this 1982 provision in 2001. But it does not explain how that reenactment could affect the years here at issue.

For these reasons, I believe the judges have raised an important constitutional question, the answer to which at present is uncertain.

### III

I recognize that not every petition raising a difficult constitutional question warrants review in this Court. And there are prudential considerations that some might believe warrant denying certiorari here. For one thing, we face the serious embarrassment of deciding a matter that would directly affect our own pocketbooks; and, in doing so, we may risk the public's high opinion of the Court insofar as that opinion rests upon a belief that its judges are not self-interested. But the law requires judges to decide cases in which they have a self-interest where, as here, "'no provision is made for calling another in, or where no one else can take his place.'" *Will*, 449 U. S., at 214 (quoting *Philadelphia* v. *Fox*, 64 Pa. 169, 185 (1870)). Nor should judges, who are called upon to protect the least popular cause and the least popular person where the Constitution demands it, be moved by potential personal embarrassment. Whenever a court considers a matter where public sentiment is strong, it risks public alienation. But the American public has understood the need and the importance of judges deciding important constitutional issues without regard to considerations of popularity.

One might also argue that the matter is not important enough to consider now, because over time Congress will deal with the decline in judicial compensation, making good on the 1989 Act's inflation-adjustment promise—that real judicial salaries will not fall significantly unless those of the typical American worker or the typical civil servant decline significantly as well. The implementation of the Ethics Act, however, does not support this view. Since 1989, Congress has refused to follow the Act's mandate about half the time. The real salaries of district court judges

have declined about 25 percent in the past several decades. The American Bar Association, the Federal Bar Association, and the American College of Trial Lawyers, in support of the petitioner judges, tell us that, while real judicial compensation fell below that of typical mid-level (and a few first-year) law firm associates and many law school teachers and administrators, the real compensation earned by the average private sector worker has increased, as has that in nearly all employment categories outside high levels of Government. See Appendix, *infra*. See also Fisk, What Lawyers Earn, National Law Journal, Oct. 2, 2000, p. A31; 2001 Society of American Law Teachers Equalizer, Issue 1, p. 2 (Apr. 2001). The consequence, in the professional organizations' view, is that compensation-related judicial resignations have reached an all time high, a particularly serious matter given rapidly rising caseloads. Cf. The Federalist No. 78, at 471–472 (stressing importance of professional experience).

The Compensation Clause, of course, is not concerned with the absolute level of judicial compensation. Judges are paid significantly more than most Americans and no less than Members of Congress and many other high-level Government workers. It is up to Congress to decide what that level of pay ought to be. But this case is not about what judges' labor should be worth. It is about a congressional decision in 1989 to protect federal judges against undue *diminishment* in real pay by providing cost-of-living adjustments to guarantee that their salaries would not fall too far behind inflation. Cf. REHNQUIST, C. J., 2001 Year-End Report on the Federal Judiciary 2 (Jan. 1, 2002) ("But a COLA only keeps judges from falling further behind the median income of the profession"). This congressional decision was tempered only with the caveat that judges would not be protected against salary diminishment if such protection would give judges a benefit that the average American worker and the average federal employee had been denied. The Compensation Clause assures judges that, once Congress has made such a decision, a later Congress cannot overturn it. This is not a novel concept; it has been engrained since the Founders drafted the Clause to protect against the risk that Congress would attempt to change the conditions of judges "for the worse." The Federalist No. 79, at 473 (A. Hamilton).

Congress, of course, has treated judges no worse than it has treated itself. It has cut its own real salaries just as it has cut

those of the judges. And its doing so may well work similar harm upon all Federal Government institutions. The Compensation Clause, however, protects judicial compensation, not because of the comparative importance of the Judiciary, but because of the special nature of the judicial enterprise. That enterprise, Chief Justice Marshall explained, may call upon a judge to decide "between the Government and the man whom that Government is prosecuting: between the most powerful individual in the community, and the poorest and most unpopular." Proceedings and Debates of the Virginia State Convention of 1829–1830, p. 616 (1830). Independence of conscience, freedom from subservience to other Government authorities, is necessary to the enterprise. The Compensation Clause helps to secure that judicial independence. When a case presents a serious Compensation Clause question, as this case does, we should hear and decide it.

## IV

To summarize: this case focuses upon monetary inflation—a phenomenon familiar to the Nation's founders, but absent during much of the 19th century. By reducing the purchasing power of salaries specified in fixed dollar amounts, inflation leaves it to Congress to determine whether a judge's standard of living will be reduced or maintained. The judges concede that the Compensation Clause *itself* does not require periodic readjustment of judicial salaries in order to maintain their real value. The question in the present case is whether that Clause offers protection when Congress *chooses* to promise a stable purchasing power.

Here, Congress, not the Constitution, wrote the guarantee at issue. It enacted a statute promising that real federal judicial salaries will be essentially maintained, but only if, and insofar as, *both* (1) the average worker *and* (2) the average civil servant also have seen their own real salaries maintained. The constitutional question is whether the Compensation Clause permits a later Congress to renege on that commitment. The court below held, in effect, that there is no way in which Congress can assure prospective judges that the purchasing power of their promised salary will be maintained: Any commitment by one Congress (even one accompanied by a reduction in judges' permissible outside income) can be repudiated by a later Congress, no matter how serious the inflation-produced erosion of real compensation. For the reasons set forth, I believe that holding may well be wrong. And because

I believe the question an important one, I would grant the writ of certiorari.

[Appendixes to opinion of BREYER, J., follow this page.]