O’MALLEY, Circuit Judge,
with whom MAYER and LINN, Circuit Judges, join, concurring.
I join the majority, both in the judgment it reaches and in its reasoning. I write separately to address two issues.
First, I write to explain why I believe that, if United States v. Will, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980), must be read as broadly as the dissent and the Williams v. United States, 240 F.3d 1019 (Fed.Cir.2001) majority believes it must, then Will was wrong and the Supreme Court should say so. Second, I write because I believe that, whatever its current statutory reach, Section 140 is unconstitutional and Congress can no longer rely on it to stagnate judicial compensation.
I
I first turn to Will. I agree with the majority that Will did not reach the issue presented here and, thus, does not dictate the result we may reach today. The position taken by the dissent, and by the Williams majority before it, is not without some force, however. One cannot deny that the adjudicatory principles upon which they rely are important ones, even if the majority concludes they are not determinative here. If the dissent is correct that we are forced to glean sweeping Compensation Clause principles from Will governing all forms of statutory enactments designed to increase judicial pay, we must also be forced to conclude that Witt’s analysis is flawed, both jurisprudentially and constitutionally.
A. Jurisprudentially
I find several aspects of the Will decision problematic. First, a close look at the facts and reasoning in Will reveals its internal inconsistency; neither its analysis nor its ultimate conclusion matches the facts presented. Specifically, while the Court in Witt initially characterized the statutory scheme at issue there as “automatic,” 449 U.S. at 223, 101 S.Ct. 471, it later justified its Compensation Clause holding by characterizing congressional action blocking salary increases under the scheme as merely modifying “the formula” by which “future” increases were to be calculated. Id. at 227-28, 101 S.Ct. 471. Next, if the language employed in Witt is meant to set down a “vesting” principle applicable in all Compensation Clause challenges, I believe the Court both: (1) violated the long-standing principle that courts are to decide only the cases before them and must only reach constitutional issues if and to the extent necessary; and (2) landed upon a holding that, taken to its logical extreme, creates absurd results.
1. Use of the Term “Automatic”
As the majority notes, the statutory scheme at issue in Witt — the Executive Salary Cosl^of-Living Adjustment Act of 1975, Pub. L. 94-82, 89 Stat. 419 (Aug. 9, 1975) (“the Adjustment Act”) — was a complex scheme, fraught with discretion and uncertainty. Despite this, Will characterized the Adjustment Act as a pay adjust *1193 ment scheme which contemplated “automatic” pay increases. At issue in Will was the constitutionality of Congress’s decision to enact statutes preventing high-level Executive, Legislative, and Judicial officials, including Article III judges, from receiving COLAs in four consecutive years where General Schedule federal employees received increases. The Court noted that these blocking statutes were designed to “stop or to reduce previously authorized cost-of-living increases initially intended to be automatically operative” under the Adjustment Act. Will, 449 U.S. at 203, 101 S.Ct. 471 (emphasis added). The Court then phrased the question presented in Will as: “when, if ever, does the Compensation Clause prohibit the Congress from repealing salary increases that otherwise take effect automatically pursuant to a formula previously enacted?” Id. at 221, 101 S.Ct. 471 (emphasis added).
As the majority notes, it is hard to understand the Court’s use of the term automatic in the context of the Adjustment Act. Normally, to say something is “automatic” is to say it occurs involuntarily or without further debate. See Oxford English Dictionary def. A(l); A(7)(a) (3d ed. June 2011; online version June 2012); see also American Heritage Dictionary 121 (5th ed. 2011) (def. 2a: defining “automatic” as “[ajcting or done without volition or conscious control; involuntary”). Nothing about the judicial salary adjustments at issue in Will was “automatic,” however.
To the contrary, the adjustments at issue in Will were based on civil service salary adjustments that were entirely discretionary. As explained by the majority, whether federal employees would receive a COLA, and in what amount, depended on the initial recommendations of an adjustment agent which were then subject to review by an Advisory Committee, the President, and Congress. This procedure hardly can be described as one that occurs involuntarily. In addition, the statutes setting forth future COLAs were “neither definite nor precise,” and nothing provided that adjustments would be calculated “in a mechanical way.” Williams v. United States, 535 U.S. 911, 917, 122 S.Ct. 1221, 152 L.Ed.2d 153 (2002) (Breyer, J., joined by Scalia and Kennedy, JJ., dissenting from denial of certiorari). Because the statutory scheme under the Adjustment Act “was imprecise as to amount and uncertain as to effect,” the Court’s characterization of the increases under the Adjustment Act as “automatic” is difficult to follow. See id.
The dissent explains the Court’s mischaracterization of the Adjustment Act’s pay scheme by noting that, for the years in question in Will, the statutory scheme had run its course and resulted in a recommended salary increase by the time Congress acted to block those increases. This, the dissent seems to suggest, explains why the Supreme Court used the term “automatic” to describe what was before it. While that argument has a certain logic to it, it does not explain why the Court’s constitutional analysis focused on the absence of a guarantee under the Adjustment Act.
According to the Supreme Court, the Adjustment Act did not “alter the compensation of judges; it modified only the formula for determining that compensation.” Will, 449 U.S. at 227, 101 S.Ct. 471 (emphases in original). And, the Court said that the blocking statutes merely represented a decision to “abandon” that “formula.” It then admonished that, “[t]o say that the Congress could not alter a method of calculating salaries before it was executed would mean the Judicial Branch could command Congress to carry out an announced future intent as to a decision the Constitution vests exclusively in the Con *1194 gress.” Id. at 228, 101 S.Ct. 471 (emphasis added). It was on this reasoning that the Court concluded that a salary increase does not “vest” for Compensation Clause purposes until it becomes part of a judge’s compensation that is due and payable and that Congress had not violated the Compensation Clause when it did not allow certain increases under the Adjustment Act to “vest.”
Thus, the Court explained its Compensation Clause decision in Will by saying it was only dealing with a formula regarding an expressed “future intent” to provide increases; the Court did not say at that point that it was addressing increases that had already been decided upon. More importantly, it did not say it was addressing definite increases that had been promised by operation of law; in explaining its assessment of the Act vis-a-vis the Compensation Clause, the Court spoke of the scheme under the Adjustment Act as one that promised no more than potential adjustments. And, in discussing the concept of vesting, the Court seemed to back away from the notion that it was dealing with anything one could consider “automatic” in the common sense of that word. How can an increase occur “automatically” if a right to it had not yet “vested”?
While I understand why the dissent believes we must assume the Supreme Court meant what it said when it described the Adjustment Act increases as “automatic” ones, that assumption would mean that the Court’s description of the facts presented had little correlation with its reasoning for why those facts did not run afoul of the Compensation Clause.
2. Constitutional Avoidance
Next, if we read Will as broadly as Williams did, and the dissent now does, we must assume that, in Will, the Supreme Court violated its own well-established principle of constitutional avoidance. The Supreme Court has long-recognized that “[jjudging the constitutionality of an Act of Congress is ‘the gravest and most delicate duty that this Court is called upon to perform.’” Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 130 S.Ct. 876, 917-18, 175 L.Edüd 753 (2010) (Roberts, C.J., concurring) (quoting Blodgett v. Holden, 275 U.S. 142, 147-48, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (Holmes, J., concurring)). The Court’s standard practice, therefore, has been to “refrain from addressing constitutional questions except when necessary to rule on particular claims before [it].” Id. at 918 (citing Ashwander v. TVA 297 U.S. 288, 346-48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J., concurring)). In furtherance of this practice, it has long been the rule that courts should “not ‘formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.’ ” Ashwander, 297 U.S. at 347, 56 S.Ct. 466 (quoting Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885)); see also United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) (same).
Applying this principle in Citizens United, Chief Justice Roberts explained that the Court’s “standard practice of avoiding broad constitutional questions except when necessary” gives rise to an “order of operations,” whereby the Court considers the narrowest claim first before proceeding, if necessary, to any broader claims. 130 S.Ct. at 918. Only if there is no valid narrow constitutional ground available, should the court resolve any broader constitutional question. See id.
If we assume that Will is to be read so broadly as to control the result under the very different set of facts presented here, we must also assume the Court spoke to a *1195 question not before it. The constitutional question properly raised in Will was whether, under the specific statutory scheme set out in the Adjustment Act, the four blocking statutes at issue diminished judicial pay in violation of the Compensation Clause. A fair reading of Will based on “the precise facts to which it [was] applied,” requires limiting the holding to the statutory scheme that was before the Court. See Ashwander, 297 U.S. at 347, 56 S.Ct. 466 (Brandéis, J., concurring) (citation omitted); see also Raines, 362 U.S. at 21, 80 S.Ct. 519. If Will is read to address a question broader than that presented — one that would govern a host of different congressional efforts to protect judicial pay from diminution in value— then we must conclude that, in Will, the Supreme Court ignored its own governing jurisprudential principles.
In its briefing, the government concedes that there was a narrower approach the Court could have taken. Specifically, the government argues that, “even if the Supreme Court in Will could have based its decision upon the ‘discretionary’ character of the then-applicable statutory scheme, the Court did not decide the case upon that ground. The Court drew no such distinction.” Appellee’s Br. 26-27. If the government is right on this point, it is the very reason why Will was wrong to make the pronouncements upon which the government now relies. If the Court in Will consciously chose not to draw a distinction between a discretionary COLA scheme and a self-executing, non-discretionary one, it: (1) formulated a rule of constitutional law broader than required by the facts presented; and (2) ignored the fundamental precept that judges decide only the cases before them. See Hein v. Freedom from Religion Found., Inc., 551 U.S. 587, 615, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (“Relying on the provision of the Constitution that limits our role to resolving the ‘Cases’ and ‘Controversies’ before us, we decide only the case at hand.”)
3. Absurd Results
Finally, the definition of “vesting” Williams gleaned from Will cannot be right. If it were: (1) Congress could do away with judicial retirement benefits for all sitting judges; (2) it would be inconsistent with the way the concept of vesting has been applied to similar pay increases for Members of Congress; and (3) it would run afoul of the common law understanding of the way in which future interests “vest” for all other purposes. It necessarily would lead to absurd results.
First, if the definition of “vesting” Williams felt bound to under Will is correct, then Congress could eliminate judicial retirement pay for all sitting Article III judges without violating the Compensation Clause. By statute, Article III judges can retire with full pay once they reach a certain combination of age plus years of judicial service. See 28 U.S.C. § 371. Under this system, the Supreme Court has said that the right to receive retirement pay “d[oes] not vest until retirement” and the “system provide[s] nothing for a judge who le[aves] office before age 65.” United States v. Hatter, 532 U.S. 557, 575, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001). In other words, the Supreme Court has specifically held that retirement benefits do not vest until a judge retires and certain prerequisites are met.
In Will, the Court concluded that vesting occurs when a salary increase “takes effect as part of the compensation due and payable to Article III judges.” 449 U.S. at 229, 101 S.Ct. 471. As such, for those years where the COLAs at issue in Will had not yet become “due and payable,” the Court held that the blocking statutes did not violate the Compensation Clause’s pro *1196 hibition against diminishing judicial pay. See id. If we accept Will’s holding that Congress can abolish judicial salary adjustments at any time before they take effect, it logically follows that Congress would also be free to abolish judicial retirement pay at any time. The practical consequences of Will would place judicial retirement benefits at risk, despite the fact that the Supreme Court itself previously has characterized such benefits as “compensation” under Article III. See Hatter, 532 U.S. at 574, 121 S.Ct. 1782 (“the noncontributory pension salary benefits [are] themselves part of the judge’s compensation”).
Second, Will’s definition of vesting conflicts with the way in which that concept has been applied in the context of the Twenty-Seventh Amendment. In Boehner v. Anderson, 30 F.3d 156 (D.C.Cir.1994), the court addressed whether the 1989 Act (which also applies to Members of Congress) was inconsistent with the Twenty-Seventh Amendment which provides that: “No law, varying the compensation for services of the Senators and Representatives, shall take effect until an election of Representatives shall have intervened.” Id. at 159. The court held that the phrase “shall take effect” in the Amendment referred to the date the Ethics Reform Act first became operative — i.e., 1991 — rather than any earlier or later point in time. See id. at 161-62. Because the COLA provision of the Ethics Reform Act took effect in January 1991, after an intervening election in 1990, that provision did not violate the Twenty-Seventh Amendment. Id. at 162. The court also held that: (1) Congress is free to specify a formula for future and continuing salary increases; and (2) the COLAs under the 1989 Act were designated to occur automatically each year after 1991, with no additional law necessary. Id. at 162-63. All yearly COLAs beyond 1990 thus became operative and “vested” for Members of Congress when the law was first effective in 1991.[1]
In Williams, the appellee-judges relied on the holding in Boehner to contend that the COLA increases for judicial officers took effect, or vested, when the law was effective, not when the yearly COLAs became due and payable. Williams, 240 F.3d at 1036. This court recognized the holding in Boehner, but distinguished it on grounds that it dealt with a different question limited to Members of Congress. Specifically, the court found that Boehner “has no relevance ... to the question of whether the judicial pay aspects of the 1989 Act could, consistent with Article III, be revised or abrogated by later Acts of Congress.” Id. at 1037. That question, the Williams court held, was already answered in the affirmative in Will’s holding that “vesting, for federal judges under Article III, occurs only when compensation begins to accrue to the judges, not when a particular adjustment formula is enacted.” Id. at 1036-37. By simply relying on Will to distinguish Boehner, the court in Williams avoided the more difficult task of trying to reconcile two contradictory approaches to what vesting means under the Constitution.
We are now faced with two distinct definitions of the constitutionally effective date of congressionally enacted COLAs. While Will provides that, for Article III purposes, a COLA is effective when it becomes “due and payable,” regardless of *1197 when the law establishing that COLA was enacted or when it took effect, Boehner states that, for Article I and the Twenty-Seventh Amendment, a COLA vests when the law is first effective, even if not due and payable for years to come. Common sense and basic principles of interpretation counsel against drawing this distinction.
While it is certainly true that the operative date of congressionally designated salary increases is not prescribed in the Constitution, both the Compensation Clause and the Twenty-Seventh Amendment address the Framers’ concerns with in-term salary changes for the respective branches of government — one with decreases in-term and the other with increases in-term. I see no reason why the concept of vesting should be employed in a way to expand Congress’s ability to decrease judicial salaries under the Compensation Clause and be reframed under the Twenty-Seventh Amendment so as to expand Congress’s ability to increase its own.
Finally, the vesting rule articulated in Will is an outlier. As this court in Williams correctly noted, “Mypically, ‘vesting’ of future interests only requires two components: an identification of the future owner, and certainty that the property would transfer.” 240 F.3d at 1032 (citing 2 Blackstone Commentaries 168; Simes & Smith, The Law of Future Interests, § 65, pp. 54-55 (2nd ed. 1956)). This view of vesting of future interests is “more consistent with black-letter [law].” See id. at 1038. The Supreme Court, nevertheless, “departed from traditional vesting rules” for future interests and announced a peculiar “actual possession” rule for Article III. Id. at 1032. Will ignored the standard rule for vesting of future interests and created a unique rule solely for judicial compensation. See id. at 1038. Despite recognition of its illogie, the Williams panel felt compelled to reject the use of traditional vesting rules for Compensation Clause purposes because it found those rules to be “simply contrary to the rule established by the Supreme Court in Will.” Id. at 1033.[2]
If we are to believe that Will advanced such an extreme vesting rule — one applicable only to the Compensation Clause— then the Court should reexamine that rule and correct its mistake. Had the Supreme Court in Will applied the generally-accepted rule for vesting of future interests to the Adjustment Act, the same one the Boehner court applied to congressional pay increases, then a COLA whose formula was codified by law would vest, at an absolute minimum, once the amount of the COLA was established for a particular year. This approach is grounded in “sound equitable principiéis]” and, as we recognized in Williams, has deep common-law roots. See id. at 1032-33.
For the reasons explained in further detail below, as the majority has noted, a more reasonable, consistent, and logical definition of “vesting” under Article III should be governed by the “reasonable expectations” of sitting judicial officers. *1198 Put simply, if we are to read Will as broadly as Williams did, and the dissent now does, the Court should revisit Witt’s unique vesting rule.
B. Constitutionally
If Witt truly established an “actual possession” vesting rule for Compensation Clause purposes, that holding seems indefensible under the Constitution. The Framers formulated the Compensation Clause for the express purpose of maintaining judicial independence, in part by providing judges with reasonable expectations about their pay and the inability of Congress to reduce it. As interpreted in Williams, the Will rule defeats the Framers’ intent and threatens the governmental structure around which the Constitution was formulated.
1. Historical Perspective and the Framers’ Intent
The Compensation Clause “has its roots in the longstanding Anglo-American tradition of an independent Judiciary.” Witt, 449 U.S. at 217, 101 S.Ct. 471. As the Supreme Court has recognized, the “colonists had been subjected to judicial abuses at the hand of the Crown, and the Framers knew the main reasons why: because the King of Great Britain ‘made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries.’ ” Stem v. Marshall, — U.S. -, 131 S.Ct. 2594, 2609, 180 L.Ed.2d 475 (2011) (quoting the Declaration of Independence, para. 11). Against this backdrop, the Framers designed Article III to protect the public “from a repeat of those abuses.” Id. By giving judges life tenure and preventing the other branches from reducing judicial compensation, the Framers sought to “preserve the integrity of judicial decisionmaking.” Id.
As the majority notes, in Federalist 79, Alexander Hamilton emphasized the importance of protecting judicial compensation. Specifically, he argued that, “[n]ext to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support.” The Federalist No. 79 at 385 (Alexander Hamilton) (Lawrence Goldman ed., 2008). Hamilton observed that, “[i]n the general course of human nature, a power over a man’s subsistence amounts to a power over his will.” Id. at 386 (emphasis in original). For this reason, the legislative branch must not “change the condition[s] of the [judiciary] for the worse” so that “[a] man may then be sure of the ground upon which he stands, and can never be deterred from his duty by the apprehension of being placed in a less eligible situation.” Id.
Hamilton’s concerns, and those of many other Framers, were not merely academic. Indeed, throughout the former colonies, legislatures took retributive actions against judges with whom they disagreed, including attempts to remove judges who declared particular laws unconstitutional and to call judges before the legislature to answer for specific rulings. See Julius Goebel, Jr., Antecedents and Beginnings to 1801, in 1 History of the Supreme Court of the United States, 133-42 (Paul A. Freund ed., 1971). These events further supported the founders’ desire to insulate judges from the influence and control of the other branches of government.
The Supreme Court has recognized that the primary purpose of the prohibition against reducing judicial salaries is “not to benefit the judges, but ... to promote that independence of action and judgment which is essential to the maintenance of the guaranties, limitations, and pervading principles of the Constitution.” Evans v. Gore, 253 U.S. 245, 253, 40 S.Ct. 550, 64 *1199 L.Ed. 887 (1920), overruled on other grounds by Hatter, 532 U.S. at 571, 121 S.Ct. 1782. The Compensation Clause should be “construed, not as a private grant, but as a limitation imposed in the public interest.” Id. It is the public that benefits from a strong, independent judiciary that is free to issue decisions without fear of repercussion.
The Framers’ desire to insulate judicial pay from the political process was the subject of much debate and angst. While, given the long tenure judges would be asked to serve, there was no doubt some provision should be made for salary increases, the Framers also feared that, if salary decisions were left entirely to Congress, the judiciary might be forced to curry favor with Congress to secure reasonable compensation increases. See Jonathan L. Entin & Erik M. Jensen, Taxation, Compensation, and Judicial Independence, 56 Case W. Res. L. Rev. 965, 972 (2006). To address this concern, James Madison suggested indexing judicial pay to the price of wheat or another stable value. The Framers rejected that idea, however, for fear fluctuations in commodity prices, like inflation, might leave judges undercompensated. See 2 The Records of the Federal Convention of 1787 44-45 (Max Farrand ed., 1911).
Thus, while the Framers foresaw a need for in-term increases in judicial salaries and were concerned with leaving the task of providing those increases to Congress, they saw no alternative; no self-executing system they could devise seemed adequate to ensure that, given the dual effects of inflation and rising standards of living, judges would not be left undercompensated. So trust Congress they did, leaving to it the responsibility to guard against real decreases in judicial salary by future legislative enactments.
In sum, the Framers intended to provide judges reasonable expectations about their pay. The Framers, to be sure, did not contemplate that a judges’ reasonable expectation would mean that he or she would become wealthy by taking the bench, or that Congress necessarily would increase judicial salaries. They believed, however, that Congress would assess fairly and periodically the need for increases in judicial compensation, would provide increases when appropriate, and that, once it did so, judicial officers thereafter could rely on the fact that Congress could not take such increases away.
2. The Expectations Approach in Practice
Courts have long-endorsed this expectations-based approach to the Compensation Clause. Indeed, as Justice Breyer has noted, protecting “a judge’s reasonable expectations” is the “basic purposive focus” of the Compensation Clause. Williams, 535 U.S. at 916, 122 S.Ct. 1221 (Breyer, J„ joined by Scalia and Kennedy, JJ., dissenting from denial of certiorari). Likewise, Justice Scalia has argued that, when Congress takes away a previously-established component of the federal judicial “employment package,” it reduces compensation and thereby thwarts judicial expectations. See Hatter, 532 U.S. at 585, 121 S.Ct. 1782 (Scalia, J., dissenting) (arguing that repeal of federal judges’ exemption from the Medicare tax was a reduction of compensation because those judges “had an employment expectation of a preferential exemption from taxation”). Consistent with this expeetations-related focus, the Supreme Court has held that the Compensation Clause forbids laws “which by their necessary operation and effect withhold or take from the judge a part of that which has been promised by law for his services.” O’Donoghue v. United States, 289 U.S. 516, 533, 53 S.Ct. 740, 77 L.Ed. 1356 (1933) *1200 (quoting Evans v. Gore, 253 U.S. 245, 254, 40 S.Ct. 550, 64 L.Ed. 887 (1920)).
Other courts likewise have emphasized judicial expectations in their approach to the Compensation Clause. For example, in the early nineteenth century, the Circuit Court for the District of Columbia held that, “if [a judge’s] compensation has once been fixed by law, a subsequent law for diminishing that compensation ... cannot affect [a sitting judge].” United States v. More, 7 U.S. (3 Cranch) 159, 160 n. 2, 2 L.Ed. 397 (1805), writ of error dism’d for want of jurisdiction. In More, Congress had enacted and later abolished a system of fees for compensating justices of the peace in the District of Columbia. Id. One of the justices of the peace continued to charge fees under the abolished structure, and the government brought an indictment against him. Id. On appeal, the Circuit Court held that: (1) the compensation of justices of the peace was subject to the Compensation Clause; and (2) where a fee structure is set by law, a later-enacted statute diminishing or abolishing that structure violated the Constitution. Id. at 161. Because sitting justices had an expectation that they would receive compensation consistent with the then-existing fee structure, Congress could not take that structure away.
In Will, the Supreme Court discarded the longstanding expectations-based approach to the Compensation Clause in favor of its “due and payable” vesting rule, without clear explanation for doing so. In a terse footnote, the Court distinguished More. See Will, 449 U.S. at 228, n. 32, 101 S.Ct. 471. Specifically, the Court claimed that, in More, “the fee system was already in place as part of the justices’ compensation when Congress repealed it” whereas “the increase [via the Adjustment Act] in Year 2 had not yet become part of the compensation of Article III judges” when it was repealed. Id. Careful consideration of the facts in More reveal that this is a distinction without a difference. The justices under the fee system in More were not entitled to compensation until they actually rendered services. See More, 7 U.S. at 160 n. 2 (“This compensation is given in the form of fees, payable when the services are rendered.”). At all times, the justices knew the precise amount they could charge for a particular service, but they never knew how much their total compensation would be, for example, in a particular week. In other words, the fee system in More merely set out a structure for calculating the compensation, which was not “due and payable” — to use the Court’s terminology in Will — until the justices performed the affirmative act of rendering services.
The Adjustment Act formula was no different. In the same way that the justices under the fee system in More did not know how much they would work in a particular year, under the Adjustment Act, Article III judges did not know how much their salary would increase in a particular year, if at all. But they did know that, once the formula was enacted for the year, it became part of the compensation due. For example, looking at Year 3 in Will, if we accept the dissent’s proposition that the COLA of 5.5% became automatic once the President’s alternative plan was adopted and transmitted to Congress — which was one month before the Year 3 blocking statute was enacted — then there is no doubt that, as was the case in More, the COLA “was already in place as part of the [judges’] compensation when Congress repealed it.” See Will, 449 U.S. at 228, n. 32, 101 S.Ct. 471 (citing More, 3 Cranch at 161). In the same way that Congress was prohibited from abolishing the fee structure in More because it was part of the justices’ compensation, so too should Con *1201 gress have been prohibited from blocking the COLA for Year 3 in Will.
Given these similarities, Will’s dismissal of More is unconvincing. The two opinions are irreconcilable. Either Will is incorrect, or the Court should have said that More was wrong. The Supreme Court should return to the well-established expectations-based approach to the Compensation Clause.
3. The Consequences of Abandoning the Expectations Approach
Assuming Will’s vesting rule allows Congress to bar “automatic” COLAs promised by definitive and precise legislative enactment, that rule is contrary to the constitutional balance the Framers carefully calibrated — one which, of necessity, delegated control over judicial salaries to the legislature, but did so in a way to guard against congressional retribution for unpopular judicial decisions. So understood, Will’s vesting rule puts at risk the principles the Framers struggled so hard to foster; it threatens to make the judiciary beholden to Congress in ways which undermine its independence. The Supreme Court should rethink such a rule. See e.g., Mistretta v. United States, 488 U.S. 361, 383, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (encouraging vigilance against a “provision of law” that “impermissibly threatens the institutional integrity of the Judicial Branch”) (quoting Commodity Futures Trading Comm’n v. Schor, 478 U.S. 833, 851, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986)).
The Framers’ concerns were prescient. Statistics demonstrate that the erosion of judicial pay “has reached the level of a constitutional crisis that threatens to undermine the strength and independence of the federal judiciary.” Chief Justice John G. Roberts, Jr., 2006 Year-End Report on the Federal Judiciary, 39 The Third Branch 1, 1 (2007). Not only is this not the world the Framers contemplated, it is approaching one they most feared. As Hamilton explained, if judicial independence is “destroyed, the constitution is gone, it is a dead letter; it is vapor which the breath of faction in a moment may dissipate.” Commercial Advertiser (Feb. 26, 1802) (reprinted in The Papers of Alexander Hamilton, Volume XXV 525 (Columbia University Press 1977)).
Ill
I finally turn to Section 140 of Pub. L. No. 97-92, 95 Stat. 1183, 1200 (1981), and its role in our assessment of the legality of the congressional action challenged here. I agree with the majority that the existence of Section 140 does not change the conclusion that the failure to provide COLAs mandated by the 1989 Act is unconstitutional, whether the withholding occurred before or after Congress amended that section in 2001. As the majority explains, by its own terms, Section 140 is not applicable to the salary adjustments contemplated by the 1989 Act. If it were, however, as the government contends it is, we could hot enforce it because Section 140 is unconstitutional.
Section 140 provides as follows: Notwithstanding any other provision of law or of this joint resolution, none of the funds appropriated by this joint resolution or by any other Act shall be obligated or expended to increase, after the date of enactment of this resolution, any salary of any Federal judge or Justice of the Supreme Court, except as may be specifically authorized by Act of Congress hereafter enacted....
Pub. L. No. 97-92, § 140, 95 Stat. 1183, 1200 (1981). Section 140 was a rider to a Joint Resolution providing continuing appropriations for fiscal year 1982. In Williams, we held that the government *1202 could not rely on Section 140 as justification for the blocking statutes passed in 1995, 1996, 1997, and 1999 because Section 140 expired by its own terms on September 30, 1982. Williams, 240 F.3d at 1026 (citing Pub. L. No. 97-161, 96 Stat. 22 (1982) (extending life of provisions from March 31, 1982 to September 30, 1982); Pub. L. No. 97-92, § 102(c), 95 Stat. 1183 (1981)).
After Williams, Congress enacted legislation that amended Section 140 to provide that it “shall apply to fiscal year 1981 and each fiscal year thereafter.” Act of Nov. 28, 2001, Pub. L. No. 107-77, § 625, 115 Stat. 803 (“2001 amendment”). Today, the majority assumes that the 2001 amendment supersedes Williams’s holding that Section 140 expired, but agrees with the alternative holding in Williams that, even if not expired, the 1989 Act provides the additional authorization required by Section 140.
Were the majority’s conclusion on that point not correct, then we would be forced to conclude that Section 140 violates the Compensation Clause, both because it singles out Article III judges for disadvantageous treatment and because it violates the principle of separation of powers.
A. Section 140’s Discriminatory Effect
The Supreme Court has held that a law violates the Compensation Clause when it “effectively single[s] out ... federal judges for unfavorable treatment” in their compensation. Hatter, 532 U.S. at 559, 121 S.Ct. 1782. In Hatter, the Court struck down a statutory scheme that required sitting federal judges to pay into the Social Security system while other high-level government officials potentially were exempt from making such payments. Id. at 564, 572-73, 121 S.Ct. 1782. In finding the denial of the exemption to judges unconstitutional, the Court explained that the “practical upshot” of the statutory scheme was to disadvantage judges relative to “nearly every current federal employee.” Id. at 573, 121 S.Ct. 1782.[3]
Section 140 is no different. It only overrides the automatic annual COLAs promised in the 1989 Act for judicial officers. All other federal employees — including high ranking Executive Branch appointees and Members of Congress — remain entitled to those “automatic” adjustments. Only judicial officers are beholden to Congress for an additional affirmative legislative enactment before they may receive the 1989 Act’s COLAs. Thus, post-2001, Section 140 turns the 1989 Act into a law that provides a financial benefit to all federal employees other than judges and puts the judiciary in the position of annually needing to “curry favor” with the legislature for compensation increases, just as the Framers feared. That clearly violates the Compensation Clause. See Hatter, 532 U.S. at 576, 121 S.Ct. 1782; Williams, 535 U.S. at 911, 122 S.Ct. 1221 (Breyer, J., joined by Scalia and Kennedy, JJ., dissenting from denial of certiorari) (“[Section 140] refers specifically to federal judges, and it imposes a special legislative burden upon their salaries alone. The singling out of judges must throw the constitutionality of the provision into doubt.”) (citing Hatter, 532 U.S. at 564, 121 S.Ct. 1782). *1203 “Judges ‘should be removed from the most distant apprehension of being affected in their judicial character and capacity, by anything, except their own behavior and its consequences.’ ” Hatter, 532 U.S. at 577, 121 S.Ct. 1782 (quoting James Wilson, Lectures on Law (1791), in 1 Works of James Wilson 364 (J. Andrews ed. 1896)).
The fear of disadvantageous treatment of judges under Section 140, as amended, is not hypothetical. Until recently, annual adjustments for federal judges remained in step with those for Executive Branch appointees and Members of Congress. When those groups received automatic adjustments under the 1989 Act, Congress also enacted the necessary special legislation to authorize an adjustment for judges. In fiscal year 2007, however, both General Schedule employees and Executive Branch appointees received an automatic adjustment under the 1989 Act, but Congress did not enact special legislation to adjust judicial salaries. The same thing happened in fiscal year 2010. Thus, the link between judicial salary adjustments and those for Executive Branch appointees was severed such that all nonelected federal employees other than Article III judges received COLAs in those years.[4] This is the very sort of individualized treatment of the judiciary that the Supreme Court has characterized as a “disguised legislative effort to influence the judicial will.” See Hatter, 532 U.S. at 571, 121 S.Ct. 1782. Little could be more inconsistent with the Framers’ purpose and construct under the Compensation Clause.
B. Section 140 and the Separation of Powers
Section 140 separately poses a separation of powers problem because it conditions the award of COLAs to judges on the receipt of salary adjustments by Members of Congress. The government argues that, in enacting the 1989 Act, “Congress made clear its intent to maintain a system of salary parity among Federal judges, members of Congress, and high-level Executive branch officers.” Appellee’s Br. 17 (citing Report of the Bipartisan Task Force on Ethics on H.R. 3660, Government Ethics Reform Act of 1989, 135 Cong. Rec. 30,756 (Nov. 21, 1989)). As noted above, any “parity” objective vis-a-vis Executive Branch officers has been abandoned. And, it is precisely because Congress has continued to use Section 140 to force a parity between judicial salaries and its own that Section 140 violates the principle of separation of powers.
The concern with the independence of the judiciary is one which flows directly from the tripartite form of government on which the Constitution is structured. In establishing the system of divided powers in the Constitution, the Framers believed it was essential that “the judiciary remain! ] truly distinct from both the legislature and the executive.” Stem, 131 S.Ct. at 2608 (quoting The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton)). Accordingly, as the Supreme Court has noted, the Framers built into the Constitution “a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.” Mistretta, 488 U.S. at 382, 109 S.Ct. 647 (quoting Buckley v. Valeo, 424 U.S. 1, 122, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). Although the three branches “are not hermetically sealed from one another,” Article III was designed to impose certain “basic limitations that the other branches may not transgress.” Stem, 131 S.Ct. at 2609 *1204 (citing Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977)).
As noted earlier, the compromise the Framers struck under the Compensation Clause was one which would entrust to Congress the power and obligation to ensure reasonable salary adjustments for the judiciary over time. This was a compromise born of necessity, however; this mechanism for judicial salary adjustments was not meant to tie those adjustments to legislative salary changes, or to make them dependent on prevailing political winds. The Framers certainly did not mean to use the Compensation Clause to blur the lines between the legislative and judicial branches. That is precisely what Section 140 does, however.
Congress has used Section 140 to link judicial pay to its own, affirmatively authorizing judicial compensation increases thereunder only in years where Congress finds it politically palatable to allow increases in its own. By using Section 140 in this way, Congress has ignored its constitutional duty to assess independently the adequacy of judicial compensation. And, it has ignored the obligation entrusted to it by the Framers to jealously guard the independence of the judiciary. “[Wjhether the Judiciary is entitled to a compensation increase must be based upon an objective assessment of the Judiciary’s needs if it is to retain its functional and structural independence.” Maron v. Silver, 14 N.Y.3d 230, 899 N.Y.S.2d 97, 925 N.E.2d 899, 914 (2010) (finding link between legislative and judicial pay increases unconstitutional under New York state constitution).
Because Section 140 skirts Congress’s obligations under the Compensation Clause and undermines the independence of the judiciary, it is unconstitutional. The Supreme Court repeatedly has made clear that it is the laws that “threaten[] the institutional integrity of the Judicial Branch” that violate the principle of separation of powers. Mistretta, 488 U.S. at 383, 109 S.Ct. 647 (quoting Commodity Futures Trading Comm’n v. Schor, 478 U.S. 833, 851, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986)). Under these well-established guideposts, Section 140 must fail.
IV
I agree with the majority that the failure to provide COLAs promised by the 1989 Act to the judiciary violates the Compensation Clause. I also agree that Will does not dictate a contrary result. “General propositions do not decide concrete cases.” Lochner v. New York, 198 U.S. 45, 76, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J., dissenting). The general concepts espoused in Will simply do not address the very concrete and different set of facts before us. If the Supreme Court concludes Will must be read as broadly as this Court felt forced to read it in Williams, however, Will must be overruled. To the extent Section 140 plays any role in the Court’s analysis of the issues presented here, moreover, the Supreme Court should address its constitutionality and put its use to rest.
WALLACH, Circuit Judge,
concurring.
I concur in the results, and in the reasoning of the decision, including the necessity of making this important determination that Congress may not exceed constitutional bounds in its relationship with the judiciary. I write separately only to clarify that this decision does not mean that any particular federal judge other than plaintiffs will necessarily accept accrued back pay.

. In the alternative, the appellant in Boehner argued that, if the court found the COLA provision vested and constitutional, then a later-enacted statute that cancelled a planned COLA absent an intervening election violated the Twenty-Seventh Amendment. 30 F.3d at 162. Although the answer to that question would be of interest to us now, the court declined to address it. See id. at 162-63.

. Indeed, despite awareness of Will, various state courts interpreting analogous provisions of their own constitutions have held that the failure to provide statutorily promised COLAs unconstitutionally diminishes judicial compensation. See e.g., Jorgensen v. Blagojevich, 211 Ill.2d 286, 285 Ill.Dec. 165, 811 N.E.2d 652, 664 (2004) (noting that the standards for conferring and calculating COLAs, which "were formulated following the United States Supreme Court’s decision in Will, expressly provided that COLAs were to be given on July 1, 1991, and on July 1 of each year thereafter and that such COLAs were to be considered a ' component of salary fully vested at the time the Compensation Review Board's report became law”). Will’s "vesting” rule for Compensation Clause challenges — if that is really what it is — stands alone.

. Justice Scalia did not join in this portion of the Court's opinion, concurring on grounds that the Compensation Clause was violated because the congressional action violated the judicial officers' reasonable expectations about their future income package. Hatter, 532 U.S. at 586, 121 S.Ct. 1782 (Scalia, J., concurring in part and dissenting in part) ("I disagree with the Court’s grounding of this holding on the discriminatory manner in which the extension occurred.”). The "discrimination” theory, however, received the votes of a majority of the Justices and, therefore, is binding precedent.

. Members of Congress did not receive salary adjustments in 2007 or 2010 because they affirmatively chose to opt out of their right to receive them under the 1989 Act. That choice was theirs, however, and not one otherwise mandated by preexisting legislation.